**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 13, 2005**

GARY and KATHY HENRY, *et al.*,
    Plaintiffs-Appellees,

v                                         No. 125205

THE DOW CHEMICAL COMPANY
    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

The 173 plaintiffs in this matter have asked to represent a putative class of thousands in an action against defendant, The Dow Chemical Company. Their core allegation is that Dow's plant in Midland, Michigan, negligently released dioxin, a synthetic chemical that is potentially hazardous to human health,[1] into the

---

[1] According to the Attorneys' Dictionary of Medicine, v 2, p D-145, dioxin is

> [a] synthetic chemical that occurs as a byproduct in the manufacturing of trichlorophenol. Animal studies have shown dioxin to be a potent carcinogen. It is also believed to have

Footnotes continued on following page.

Tittabawassee flood plain where the plaintiffs and the putative class members live and work.

This situation appears, at first blush, to have the makings of a standard tort cause of action. But closer inspection of plaintiffs' motion for class certification reveals that one of plaintiffs' claims is premised on a novel legal theory in Michigan tort law and thus raises an issue of first impression for this Court.

In an ordinary "toxic tort" cause of action, a plaintiff alleges he has developed a disease because of exposure to a toxic substance negligently released by the defendant. In this case, however, the plaintiffs do not allege that the defendant's negligence has actually caused the manifestation of disease or physical injury. Instead, they allege that defendant's negligence has created the *risk* of disease—that they *may* at some indefinite time in the future develop disease or physical injury because of defendant's allegedly negligent release of dioxin.

Accordingly, the plaintiffs have asked the circuit court to certify a class that collectively seeks the

teratogenic effects. Chloracne (a skin condition similar in appearance to severe acne) is known to be associated with exposure to dioxin; metabolic, hepatic (liver) and neurological disturbances have also been reported.

2

creation of a program, to be funded by defendant and supervised by the court, that would monitor the class and their representatives for possible future manifestations of dioxin-related disease. The defendant moved for summary disposition, arguing that plaintiffs' medical monitoring claim was not cognizable under Michigan law. The circuit court denied this motion, and the Court of Appeals denied defendant's interlocutory application for leave to appeal.

We now reverse the circuit court order denying the motion and remand for entry of summary disposition in favor of defendant on plaintiffs' medical monitoring claim. Because plaintiffs do not allege a *present* injury, plaintiffs do not present a viable negligence claim under Michigan's common law.

Although we recognize that the common law is an instrument that may change as times and circumstances require, we decline plaintiffs' invitation to alter the common law of negligence liability to encompass a cause of action for medical monitoring. Recognition of a medical monitoring claim would involve extensive fact-finding and the weighing of numerous and conflicting policy concerns. We lack sufficient information to assess intelligently and fully the potential consequences of recognizing a medical monitoring claim.

Equally important is that plaintiffs have asked this Court to effect a change in Michigan law that, in our view, ought to be made,if at all,by the Legislature. Indeed, the Legislature has already established policy in this arena by delegating the responsibility for dealing with health risks stemming from industrial pollution to the Michigan Department of Environmental Quality (MDEQ). As a matter of prudence, we defer in this case to the people's representatives in the Legislature, who are better suited to undertake the complex task of balancing the competing societal interests at stake.

We therefore remand this matter to the circuit court for entry of summary disposition in defendant's favor on plaintiffs' medical monitoring claim.

## FACTS AND PROCEDURAL HISTORY

Defendant, The Dow Chemical Company, has maintained a plant on the banks of the Tittabawassee River in Midland, Michigan, for over a century. The plant has produced a host of products, including, to name only a few, "styrene, butadiene, picric acid, mustard gas, Saran Wrap, Styrofoam, Agent Orange, and various pesticides including Chlorpyrifos, Dursban and 2, 4, 5-trichlorophenol." Michigan Department of Community Health, Division of Environmental and Occupational Epidemiology, *Pilot Exposure*

4

*Investigation: Dioxin Exposure in Adults Living in the Tittabawassee River Flood Plain, Saginaw County, Michigan,* May 25, 2004, p 4.

According to plaintiffs and published reports from the MDEQ, defendant's operations in Midland have had a deleterious effect on the local environment. In 2000, General Motors Corporation was testing soil samples in an area near the Tittabawassee River and the Saginaw River when it discovered the presence of dioxin, a hazardous chemical believed to cause a variety of health problems such as cancer, liver disease, and birth defects. By spring 2001, the MDEQ had confirmed the presence of dioxin in the soil of the Tittabawassee flood plain. Further investigation by the MDEQ indicated that defendant's Midland plant was the likely source of the dioxin. Michigan Department of Environmental Quality, Remediation and Redevelopment Division, *Final Report, Phase II Tittabawassee/Saginaw River Dioxin Flood Plain Sampling Study*, June 2003, p 42 (identifying Dow's Midland plant as the "principal source of dioxin contamination in the Tittabawassee River sediments and the Tittabawassee River flood plain soils").

In March 2003, plaintiffs moved for certification of two classes in the Saginaw Circuit Court. The first class

was composed of individuals who owned property in the flood plain of the Tittabawassee River and who alleged that their properties had declined in value because of the dioxin contamination. The second group consisted of individuals who have resided in the Tittabawassee flood plain area at some point since 1984 and who seek a court-supervised program of medical monitoring for the possible negative health effects of dioxin discharged from Dow's Midland plant. This latter class consists of 173 plaintiffs and, by defendant's estimation, "thousands" of putative members.

Defendant moved under MCR 2.116(C)(8) for summary disposition of plaintiffs' medical monitoring claim. The Saginaw Circuit Court denied this motion, and denied defendant's subsequent motions for reconsideration and for a stay of proceedings.

After the Court of Appeals denied defendant's motion for peremptory reversal and emergency application for leave to appeal, the defendant sought emergency leave to appeal in this Court. Discovery and other preliminary proceedings on plaintiffs' motion for class certification continued in the Saginaw Circuit Court until, on June 3, 2004, we stayed the proceedings below and granted defendant's application

for leave to appeal.[2]  *Henry v Dow Chemical Co,* 470 Mich 870 (2004).[3]

STANDARD OF REVIEW

We review de novo the circuit court's denial of defendant's motion for summary disposition under MCR 2.116(C)(8).  *Maiden v Rozwood,* 461 Mich 109, 118; 597 NW2d 817 (1999).  A movant is entitled to summary disposition under MCR 2.116(C)(8) if "[t]he opposing party has failed to state a claim on which relief can be granted."  MCR 2.116(C)(8).  In determining whether a movant has met this standard, we "'accept[] as true all well-pleaded facts.'"  *Radtke v Everett,* 442 Mich 368, 373; 501 NW 2d 155 (1993), quoting *Abel v Eli Lilly & Co,* 418 Mich 311, 324; 343 NW2d 164 (1984).

_____

[2]  Plaintiffs have since filed a motion for partial relief from stay, accompanied by a motion for immediate consideration.  In light of the issuance of this opinion, we deny the motions because they are moot.

[3]  In January 2005, defendant entered into a settlement agreement with the MDEQ regarding dioxin contamination in the Tittabawassee River valley.  See Hugh McDiarmid, Jr., *Dow, state OK plan on dioxin,* Detroit Free Press (January 20, 2005).  The agreement, which was reached after months of negotiation, provides that defendant will fund extensive cleanup efforts aimed at minimizing residents' exposure to dioxin.  *Id.*

## ANALYSIS

### I

The question presented by this appeal is whether, in seeking a court-supervised medical monitoring program for future dioxin-related illnesses, plaintiffs have stated a claim on which relief may be granted. MCR 2.116(C)(8). Plaintiffs' theory is that Dow negligently released dioxin into the Tittabawassee flood plain and that, as a result, plaintiffs must incur the costs of intensive medical monitoring for the possible health effects of elevated exposure to dioxin. Thus, at its core, plaintiffs' medical monitoring claim is one of negligence. It is usually held that in order to state a negligence claim on which relief may be granted, plaintiffs must prove (1) that defendant owed them a duty of care, (2) that defendant breached that duty, (3) that plaintiffs were injured, and (4) that defendant's breach caused plaintiffs' injuries. See *Haliw v Sterling Hts,* 464 Mich 297, 309-310; 627 NW2d 581(2001); *Schultz v Consumers Power Co,* 443 Mich 445, 459; 506 NW2d 175 (1993). These elements of an action for negligence are traditionally summarized, in a formula that ought to be familiar to any first-year law student, as "duty, breach of that duty, causation, and damages." *Fultz v Union-Commerce Assoc,* 470 Mich 460, 463; 683 NW2d 587 (2004). See also

Prosser & Keeton, Torts (5th ed), § 30, pp 164-165 (describing this "traditional formula").

Here, defendant argues that plaintiffs have not established any present physical injuries, and have therefore failed to state a valid negligence claim. We agree. As an initial matter, it is necessary for us to determine the exact nature of plaintiffs' claim. We must decide whether plaintiffs are in fact seeking compensation for future injuries they *may* suffer, or for present injuries they *have* suffered.

If plaintiffs' claim is for injuries they may suffer in the future, their claim is precluded as a matter of law, because Michigan law requires more than a merely speculative injury. This Court has previously recognized the requirement of a present physical injury in the toxic tort context. In *Larson v Johns-Manville Sales Corp,* 427 Mich 301, 314; 399 NW2d 1 (1986), for example, we held that a cause of action for asbestosis, which typically is manifest between ten and forty years after exposure, arises only when an injured party knows or should know that he has, in fact, developed asbestosis. Similarly, we held that a cause of action for asbestos-related lung cancer arises only when there has been a "discoverable appearance" of cancer. *Id.* at 319. Thus, *Larson* squarely rejects the

9

proposition that mere exposure to a toxic substance and the increased risk of future harm constitutes an "injury" for tort purposes. It is a *present* injury, not fear of an injury in the future, that gives rise to a cause of action under negligence theory.

Here, it is clear that plaintiffs do not claim that they have suffered any present physical harm because of defendant's allegedly negligent contamination of the Tittabawassee flood plain. Indeed, plaintiffs in their arguments to this Court expressly deny having any present physical injuries.[4]

Plaintiffs have not cited an exception to the rule that a present physical injury is required in order to state a claim based on negligence. Nor, indeed, does the dissent.[5] We can therefore reach only one conclusion: if the alleged damages cited by plaintiffs were incurred in

---

[4] Specifically, plaintiffs argue that "[t]hey do not seek compensation for physical injury or for the enhanced risk of future physical injury. Instead, they seek to establish a judicially administered medical screening and diagnostic program to supervise and fund the medical monitoring regime that a reasonable physician would advise for persons exposed to Dow's dioxin in the way Plaintiffs have been and are being exposed."

[5] See *post* at 9, citing a California case, *Miranda v Shell Oil Co,* 17 Cal App 4th 1651, 1657; 26 Cal Rptr 2d 655 (1993).

anticipation of possible future injury rather than in response to present injuries, these pecuniary losses are not derived from an injury that is cognizable under Michigan tort law.

However, if plaintiffs' claim is that by virtue of their potential exposure to dioxin they have suffered an "injury," in that any person so exposed would incur the additional expense of medical monitoring, then their claim is also precluded as a matter of law, because Michigan law requires an actual injury to person or property as a precondition to recovery under a negligence theory.

As noted in this opinion at 8, the elements that a plaintiff in a negligence action must prove are usually summed up in the familiar four-part test: (1) duty, (2) breach, (3) causation, and (4) damages. Although these four elements are usually the primary focus of a negligence analysis, it has always been implicit in this analysis that in order to prevail, a plaintiff must also demonstrate an actual *injury* to person or property. Indeed, such injury constitutes the essence of a plaintiff's claim.

The logic behind this injury requirement—and, indeed, the very logic of tort law—is that of "giv[ing] security to the rights of individuals by putting within their reach suitable redress whenever their rights have been actually

11

violated." Cooley on Torts (4th ed), § 32 p 57. Accordingly, an individual is entitled to relief under a tort theory only when he has suffered a present injury.[6] As Prosser and Keeton have explained:

> Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of the plaintiff's case. Nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, *where no actual loss has occurred*. The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered. [Prosser & Keeton, Torts (5th ed, § 30, p 165 (emphasis added).]

---

[6] See Cooley on Torts (4th ed), § 32, pp 57-58:

> Before any violation has in fact taken place, the law assumes that none will happen; but that each individual will respect the rights of all others. Therefore, it does not undertake in general to provide preventive remedies; it gives them in a few exceptional cases, which stand on peculiar grounds, and in which the mischiefs flowing from an invasion of rights might be such as would be incapable of complete redress in the ordinary methods, or perhaps in any manner. In most cases it is assumed that, if the law places within the reach of every one a suitable remedy to which he may resort when he suffers an injury, it has thereby not only provided for him adequate protection, but has given him all that public policy demands. The remedies that are aimed at wrongs not yet committed but only threatened, are so susceptible of abuse that they are wisely restricted within very narrow limits.

While the courts of this state may not have always clearly articulated this injury requirement, nor finely delineated the distinction between an "injury" and the "damages" flowing therefrom, the injury requirement has always been present in our negligence analysis. It has simply always been the case in our jurisprudence that plaintiffs alleging negligence claims have also shown that their claims arise from present physical injuries. We are not aware of any Michigan cases in which a plaintiff has recovered on a negligence theory without demonstrating some present physical injury. Thus, in all known cases in Michigan in which a plaintiff has satisfied the "damages" element of a negligence claim, he has also satisfied the "injury" requirement.

Plaintiffs effectively urge us to expand our common-law jurisprudence by concluding that the traditional four-part test can be met without also satisfying the requirement of a present physical injury, no doubt aware that we have never before been squarely presented with such a claim. Until now, there has never been a need for this Court to articulate specifically the injury requirement. But in light of the novel nature of plaintiffs' claims, however, it has become necessary for us to do so today. We

13

therefore reaffirm the principle that a plaintiff must demonstrate a present physical injury to person or property *in addition to* economic losses that result from that injury in order to recover under a negligence theory.

This requirement does not constitute a change in the common law of this state. While we have from time to time allowed for the development of the common law as circumstances have required, see, e.g., *Berger v Weber*, 411 Mich 1; 303 NW2d 424 (1981), the injury requirement has always been an implicit part of a negligence action in Michigan. Had we been presented in 1869 with an action against a blacksmith by local residents alleging that the blacksmith's emissions caused them the fear of physical injury *someday*, we have little doubt that this Court would have expressly articulated the injury requirement at that time. However, such a case has never before been presented to this Court, so it falls to us today to articulate what this Court has always assumed: present harm to person or property is a necessary prerequisite to a negligence claim.

The requirement of a present physical injury to person or property serves a number of important ends for the legal system. First, such a requirement defines more clearly who actually possesses a cause of action. In allowing recovery only to those who have actually suffered a present physical

14

injury, the fact-finder need not engage in speculations about the extent to which a plaintiff possesses a congizable legal claim. See Prosser & Keeton, Torts (5th ed), § 30, p 165. Second, such a requirement reduces the risks of fraud, by setting a clear minimum threshold—a present physical injury—before a plaintiff can proceed on a claim. By requiring a prospective plaintiff to make a showing of an actual physical injury, present tort law thus excludes from the courts those who might bring frivolous or unfounded suits. In particular, the fact-finder need not be left wondering whether a plaintiff has in fact been harmed in some way, when nothing but a plaintiff's own allegations support his cause of action.

Finally, and perhaps most significantly, the requirement of a present physical injury avoids compromising the judicial power. The exercise of the "judicial power" by this Court, Const 1963, art 6, § 1, contemplates that there will be standards—legally comprehensible standards— that guide the judicial branch's resolution of the matters brought before it. The present physical injury requirement establishes a clear standard by which judges can determine which plaintiffs have stated a valid claim, and which plaintiffs have not. In the absence of such a requirement, it will be inevitable that judges,

as in the instant case, will be required to answer questions that are more appropriate for a legislative than a judicial body: How far from the Titibawassee River must a plaintiff live in order to have a cognizable claim? What evidence of exposure to dioxin will be required to support such a claim? What level of medical research is sufficient to support a claim that exposure to dioxin, in contrast to exposure to another chemical, will give rise to a cause of action?

Here, it is apparent that the only "injuries" alleged by the putative representatives of the medical monitoring class are "the losses they have and will suffer as they are forced to monitor closely their health and medical condition because of their exposure to Dow's Dioxin [sic] pollution." Thus, plaintiffs have arguably stated a present *financial* injury, i.e., damages. From this description, however, it is apparent that plaintiffs do not claim that they suffer from *present physical* injuries to person or property. Rather, plaintiffs allege that they *may* develop dioxin-related illnesses in the future. At best, then, the only "injury" from which plaintiffs suffer at present is a *fear of future illness*. They seek an "equitable remedy" of a medical monitoring program not in order to redress actual or present injury to their persons

but instead to screen for possible future injury. In this way, plaintiffs' claims depart from the principles articulated earlier in this opinion by Justice Cooley and by Prosser and Keeton.

It is no answer to argue, as plaintiffs have, that the need to pay for medical monitoring is *itself* a present injury sufficient to sustain a cause of action for negligence.  In so doing, plaintiffs attempt to blur the distinction between "injury" and "damages."  While plaintiffs arguably demonstrate economic losses that would otherwise satisfy the "damages" element of a traditional tort claim, the fact remains that these economic losses are wholly derivative of a *possible, future* injury rather than an *actual, present* injury.  A financial "injury" is simply not a present physical injury, and thus not cognizable under our tort system.  Because plaintiffs have not alleged a present physical injury, but rather, "bare" damages, the medical expenses plaintiffs claim to have suffered (and will suffer in the future) are not compensable.

Plaintiffs' medical monitoring claim is also distinguishable from other causes of action, such as libel or professional malpractice, in which a plaintiff may recover for economic losses without showing present physical harm.  In a cause of action for libel, a plaintiff

17

must show an injury to his reputation.[7]   In a cause of

action for legal malpractice, a plaintiff must show an

injury to the fiduciary relationship between the attorney

and client.[8]   In each case, our common law requires a

present injury in addition to economic loss incurred as a

result of that injury.

Here, as noted, the only noneconomic injury alleged by

plaintiffs is their fear of future physical injury.

Plaintiffs' fear, however reasonable, is still not enough

to state a claim of negligence.   Even if we were to

construe plaintiffs' claim broadly as one for emotional

distress, our common law recognizes emotional distress as

the basis for a negligence action only when a plaintiff can

---

[7]. *Locricchio v Evening News Ass'n,* 438 Mich 84, 115-116; 476 NW2d 112 (1991) (stating that the elements of libel are "1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication").

[8] *Simko v Blake,* 448 Mich 648, 655; 532 NW2d 842 (1995).   "In order to state a cause of action for legal malpractice, the plaintiff has the burden of adequately alleging the following elements: '(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was a proximate cause of an injury; and (4) the fact and extent of the injury alleged.'") (Citation omitted.)

also establish *physical* manifestations of that distress.[9]

Thus, plaintiffs have not established a present, legally cognizable injury.[10]

Plaintiffs advance their claim as if it satisfies the traditional requirements of a negligence action in Michigan. In reality, plaintiffs propose a transformation in tort law that will require the courts of this state—in

---

[9] See, e.g., *Daley v LaCroix,* 384 Mich 4, 12-13; 179 NW2d 390 (1970). See also *Hesse v Ashland Oil,* 466 Mich 21, 34 (2002) (Kelly, J., dissenting) (noting that a cause of action for negligent inflication of emotional distress requires a showing of physical harm); Prosser & Keeton, *supra*, § 54, p 361 ("Where the defendant's negligence causes only mental disturbance, without accompanying physical injury, illness or other physical consequences, and in the absence of some other independent basis for tort liability, the great majority of courts still hold that in the ordinary case there can be no recovery.").

[10] Even assuming that the costs associated with plaintiffs' medical monitoring were sufficient to satisfy the "damages" element and the injury requirement of a negligence suit, we note that plaintiffs would still face substantial evidentiary hurdles with respect to the "causation" element. Significantly, while plaintiffs seek the imposition of a medical monitoring program for the possible health effects of elevated exposure to dioxin, they present no evidence that they themselves have elevated levels of dioxin in their bloodstreams, that these elevated levels are attributable in whole or in part to defendant's activities, and that these elevated levels will lead to recognized physical injuries. Further, even if plaintiffs could show the likelihood of physical injuries like those associated with exposure to elevated levels of dioxin, see n 1 of this opinion, it is still unproven at this point whether such injuries would in fact be attributable to dioxin released by defendant, as opposed to some other environmental or physiological cause.

this case and the thousands that would inevitably follow—to make decisions that are more characteristic of those made in the legislative, executive, and administrative processes. For reasons that we discuss more fully in part II, we are not prepared to acquiesce in this transformation.

Plaintiffs maintain that this Court *implicitly* recognized a medical monitoring cause of action in *Meyerhoff v Turner Constr Co,* 456 Mich 933 (1998). In *Meyerhoff,* a number of construction workers were exposed to asbestos on the job. The Court of Appeals held that "medical-monitoring expenses are a compensable item of damages where the proofs demonstrate that such surveillance to monitor the effect of exposure to toxic substances . . . is reasonable and necessary." *Meyerhoff v Turner Constr Co (On Remand)*, 210 Mich App 491, 495; 534 NW2d 204 (1995). We vacated the Court of Appeals opinion with respect to the medical monitoring claim, but included language in our order that, quite understandably, led to confusion regarding the viability of a medical monitoring claim in Michigan: "The factual record is not sufficiently developed to allow a [sic] medical monitoring damages. Accordingly, that portion of the Court of Appeals decision

which holds that medical monitoring expenses are a compensable item of damages is vacated." 456 Mich 933.

Plaintiffs read the first sentence quoted above to suggest that a factual record *may* in some circumstances be "sufficiently developed" to support medical monitoring damages. Accordingly, they maintain that an action for medical monitoring may be sustainable with a sufficiently developed record.

However, while perhaps not a model of clarity, the language of *Meyerhoff* does not support such a conclusion. *Meyerhoff* does not affirmatively state that a cause of action for medical monitoring is cognizable under Michigan law. To the contrary, our order in *Meyerhoff* vacated the part of the Court of Appeals opinion that had held precisely that. Rather, *Meyerhoff* should properly be read to hold that the factual record in that case was insufficiently developed to support a medical monitoring claim *if such a claim exists in Michigan*. As we clarify today, such a claim does *not* exist in Michigan.[11]

_____

[11] While, given the language in *Meyerhoff*, it was certainly not unreasonable for the trial court in the instant case to decline summary disposition, *Meyerhoff* nonetheless is an exceedingly thin reed on which to rest arguments in favor of a medical monitoring cause of action— a reed that must give way under the vastly greater weight
Footnotes continued on following page.

Nor are we persuaded by the opinion of the United States District Court for the Eastern District of Michigan in *Gasperoni v Metabolife, Int'l Inc,* 2000 US Dist LEXIS 20879 (ED Mich, 2000). Plaintiffs assert that the district court in *Gasperoni* "concluded that Michigan would recognize a state law claim for medical monitoring and certified a class for such a claim." A careful reading of *Gasperoni*, however, reveals that this argument mischaracterizes the district court's opinion.

The plaintiffs in *Gasperoni* consumed Metabolife 356, an appetite suppressant manufactured and distributed by the defendant. They filed an action based on theories of fraudulent misrepresentation and breach of warranty, and sought a number of remedies—including medical monitoring. *Id.* at *3-*4. The defendant in that case did not challenge medical monitoring as a cause of action. Indeed, the defendant had no reason to do so. The plaintiffs sought medical monitoring only as a form of relief and did not claim that medical monitoring was, itself, a viable cause of action. Thus, the sole issue was whether the

---

of Michigan precedent, which requires a manifest physical injury in order to state a viable negligence claim. *Meyerhoff's* Delphic allusion to a medical monitoring claim was, at most, mere dictum. The trial court thus erred in allowing plaintiffs' claim to proceed to trial.

plaintiffs' proposed class met the requirements provided in Federal Rule of Civil Procedure 23(a).

With respect to the plaintiffs' medical monitoring claim, the district court held only that the plaintiffs' medical monitoring claims were not so individualized as to preclude class certification. *Id.* at *22. Whether a medical monitoring claim was viable under Michigan law—the central issue in this appeal—was neither raised by the defendant in *Gasperoni* nor addressed by the district court in its opinion. Far from holding that Michigan would "recognize a state law claim for medical monitoring," as asserted by plaintiffs, the district court merely suggested that medical monitoring may be a proper form of injunctive *relief* in an action based on fraudulent misrepresentation and breach of warranty. Thus, as with our order in *Meyerhoff, Gasperoni* does not provide any reason to conclude affirmatively that a cause of action for medical monitoring is cognizable under Michigan law.

## II

Having determined that plaintiffs' claim cannot stand under our current law of negligence, we turn now to plaintiffs' core argument—that we should *modify* the common law of negligence in order to permit their medical monitoring claim to proceed.

This Court is the principal steward of Michigan's common law. See, e.g., *Adkins v Thomas Solvent Co,* 440 Mich 293, 317; 487 NW2d 715 (1992); *Sizemore v Smock,* 430 Mich 283, 285; 422 NW2d 666 (1988). Acting in this capacity, we have on occasion allowed for the development of the common law as circumstances and considerations of public policy have required. See, e.g., *Berger, supra.* But as Justice Young has recently observed, our common-law jurisprudence has been guided by a number of prudential principles. See Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 305-310 (2004). Among them has been our attempt to "avoid capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences," *id.* at 307, a principle that is quite applicable to the present case.

Plaintiffs have asked us to recognize a cause of action that departs drastically from our traditional notions of a valid negligence claim. Beyond this enormous shift in our tort jurisprudence, judicial recognition of plaintiffs' claim may also have undesirable effects that neither we nor the parties can satisfactorily predict. For example, recognizing a cause of action based solely on exposure—one without a requirement of a *present* injury—

would create a potentially limitless pool of plaintiffs.[12]
See, e.g., Schwartz*, Medical monitoring: Should tort law say yes?,* 34 Wake Forest L R 1057, 1079-1080 (1999) ("Once a showing of present physical injury is eliminated, as is the case in awards for medical monitoring, attorneys representing plaintiffs could virtually begin recruiting people off the street to serve as medical monitoring claimants."). Litigation of these preinjury claims could drain resources needed to compensate those with manifest physical injuries and a more immediate need for medical care. It is less than obvious, therefore, that the benefits of a medical monitoring cause of action would outweigh the burdens imposed on plaintiffs with manifest injuries, our judicial system, and those responsible for

---

[12] This was the precise situation that developed in West Virginia after the West Virginia Supreme Court of Appeals recognized a cause of action for medical monitoring in *Bower v Westinghouse Electric Corp*, 206 W Va 133, 140; 522 SE2d 424 (1999). Shortly after the *Bower* decision, a classaction was filed against major cigarette manufacturers on behalf of approximately 270,000 West Virginia smokers who had not been diagnosed with any smoking-related diseases. See *In re Tobacco Litigation (Medical Monitoring Cases)*, No. 00-C-6000 (W Va, Ohio County Cir Ct, 2001). In another medical monitoring classaction filed in West Virginia, healthy plaintiffs from seven states (Illinois, Indiana, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia) are seeking medical monitoring on the basis of alleged exposure to toxic materials. See *Stern v Chemtall, Inc*, No. 03-C-49M (W Va, Kanawha County Cir Ct, 2001).

administering and financing medical care. Because such a balancing process would necessarily require extensive fact-finding and the weighing of important, and sometimes conflicting, policy concerns, and because here we lack sufficient information to assess intelligently and fully the potential consequences of our decision, we do not believe that the instant question is one suitable for resolution by the judicial branch.[13] We are certainly not alone in our reluctance to engage in the delicate balancing of costs and benefits that plaintiffs' proposed expansion of the common law requires. Many of these concerns were noted by the United States Supreme Court in *Metro-North Commuter R Co, supra* at 442 (holding that the Federal Employers' Liability Act, 45 USC 51 *et seq.*, does not permit recovery of future medical monitoring costs).[14]

---

[13] It should not need explication that a balancing of private interests is invariably present in all legislation that establishes benefits and burdens. To name but a few: worker's compensation, unemployment compensation, and occupational health and safety. Such balancing is the essence of representative government. It is for precisely this reason that the decision whether and how to recognize a medical monitoring cause of action should be made by the people's representatives in the legislative branch of our government. See part III of this opinion.

[14] Some legal scholars and commentators have also noted the undesirability of judicially sanctioned medical monitoring claims. See, e.g., Guzelian, *supra*, p 100

Footnotes continued on following page.

There, the Court observed that judicial recognition of mere exposure to a toxic substance as a sufficient trigger for tort liability could lead to a stampede of litigation that would divert resources from more immediate and compelling

("Ill-considered monitoring can also deter diseased individuals who are erroneously proclaimed healthy from returning promptly when symptoms do present, and can lead to severe psychological harm. In addition, the economic, manpower, and time costs for such programs are usually substantial."); Martin & Martin, *Tort actions for medical monitoring: Warranted or wasteful?*, 20 Colum J Envtl L 121, 142-143 (1995) ("[C]reating a new cause of action for medical monitoring that eliminates one of the traditional elements of tort actions does not seem warranted. Its deterrent value is negligible; its compensatory function should be rendered moot by changes in the health care system; and the costs of subsequent litigation will exceed the benefits obtained.").

We cite these studies not, as the dissent argues, to endorse the authors' views, *post* at 17-18, but to observe that it is far from settled that judicially supervised medical monitoring is an unmitigated benefit for all concerned.

We also note that, while certification of a class necessarily recognizes that common issues of law or fact may predominate over individual questions at the time of certification, see MCR 3.501(A)(1)(b), there is no guarantee that such common issues will continue over time to predominate in the instant case, particularly in light of the apparently perpetual duration of the proposed monitoring program. Rather, it is more likely that increasingly competitive interests will arise within the putative class of plaintiffs—interests that must be carefully weighed against each other. The likelihood that the interests of putative class members will diverge is yet another reason for judicial deference to the Legislature in this case.

claims, such as those brought by individuals with actual disease or injury, to less meritorious claims:

> [T]ens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring. . . . And that fact, along with uncertainty as to the amount of liability, could threaten both a "flood" of less important cases . . . and the systemic harms that can accompany "unlimited and unpredictable liability . . . ." [*Metro-North Commuter R Co, supra* at 442.]

See also *Wood v Wyeth-Ayerst Labs,* 82 SW3d 849, 857 (Ky, 2002) (citing the policy concerns raised in *Buckley*); *Hinton v Monsanto Co*, 813 So 2d 827, 831 (Ala, 2001) (same).[15]

We share the concerns raised by the United States Supreme Court in *Buckley.* Simply put, judicial recognition

---

[15] It is a reality of modern society that we are all exposed to a wide range of chemicals and other environmental influences on a daily basis. For that reason alone, this Court should be wary of accepting plaintiffs' invitation to venture down the slippery slope that a medical monitoring cause of action would necessarily traverse. As the Supreme Court noted in *Buckley*: "tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring." 521 US at 442. Thus, even if we were to create a medical monitoring cause of action, in light of both the essentially limitless number of such exposures and the limited resource pool from which such exposures can be compensated, a "cutoff" line would still inevitably need to be drawn. The Legislature is better suited to draw lines of this sort, because such decisions are fraught with difficult policy determinations.

of a medical monitoring cause of action may do more harm than good—not only for Michigan's economy but also for "other potential plaintiffs who are not before the court and who depend on a tort system that can distinguish between reliable and serious claims on the one hand, and unreliable and relatively trivial claims on the other." *Buckley,* 521 US at 443-444.

Even if this Court were institutionally equipped to gauge the potential costs and benefits of sanctioning a medical monitoring cause of action, plaintiffs have done little to help us understand the ramifications that a decision in their favor might have for Michigan. When pressed at oral argument to address the potential costs and benefits of plaintiffs' proposed cause of action, for example, plaintiffs' counsel was unable to hazard a guess at how Michigan's economy might be affected:

> *Justice Taylor*: Where have you made note, or could you, of the kinds of suspected impact that monitoring will have on the business environment of this state. I don't think there's a word in your briefs about that. You just sort of assume it will be taken care of. . . .

> *Plaintiffs' Counsel*: I think if you look at the criteria [for a valid medical monitoring claim] we propose we think it has safeguards for that. We think it does allow . . .

> *Justice Taylor*: Where in your brief is there any discussion of what cost this will bear on Michigan's business climate?

29

> *Plaintiffs' Counsel*:  I don't [think] there is a particular discussion in our brief on what costs Michigan will bear.
>
> *Justice Young*:  Do you have any idea what that might be?
>
> *Plaintiffs' Counsel*:  I don't think we have any particular specific dollar idea on what that will be, no.  I don't think we have a specific dollar idea on what the cost to these people are.
>
> *Justice Taylor*:  Doesn't this point out the problem with what you're asking us to do?  We don't even know what the cost of this will be.

This line of questioning goes to the heart of why we are reluctant to alter the common law of negligence in the manner proposed by plaintiffs: however much equity might favor lightening the economic burden now borne by parties exposed to dioxin in the Tittabawassee flood plain, we have no assurance that a decision in plaintiffs' favor—which would create a hitherto unrecognized cause of action with a potentially limitless class of plaintiffs—will not wreak enormous harm on Michigan's citizens and its economy.  Such a decision necessarily involves a drawing of lines reflecting considerations of public policy, and a judicial body is ill-advised to draw such lines given the limited range of interests represented by the parties and the resultant lack of the necessary range of information on

which to base a resolution.[16]  See Young, *supra* at 307 ("Good intentions, unsupported by well informed policy choices, often result in bad law.").

We would be unwise, to say the least, to alter the common law in the manner requested by plaintiffs when  it is unclear what the consequences of such a decision may be and when we have strong suspicions, shared by our nation's highest court, that they may well be disastrous.

## III

Although the caution engendered by our difficulty in identifying, much less weighing, the potential costs and benefits of a decision in plaintiffs' favor is an important factor militating against recognizing plaintiffs' proposed

---

[16] We note that plaintiffs are in effect asking us to *create* policy, not simply consider it.  We have previously cautioned against this Court acting as a policy-making body:

> As a general rule, making social policy is a job for the Legislature, not the courts.  This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another:  The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's.  [*Van v Zahorik*, 460 Mich 320, 327; 597 NW2d 15 (1990)) (citations and quotations omitted).]

cause of action, there is a stronger prudential principle at work here: the judiciary's obligation to exercise caution and to defer to the Legislature when called upon to make a new and potentially societally dislocating change to the common law.[17]

Ours, after all, is a government founded on the principle of separation of powers.[18] In certain instances, the principle of separation of powers is an affirmative constitutional bar on policy-making by this Court.[19] In other cases, however, the separation of powers

---

[17] In suggesting that the "only question" properly posed in this case involves who should pay the costs of medical monitoring and environmental cleanup, *post* at 2, the dissent misapprehends the real question: what is the appropriate venue for determining the answer to the question? It is *this* question, not that posited by the dissent, that fundamentally divides the majority and the dissenting opinions.

[18] See Const 1963, art 3, § 2: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

[19] See, e.g., *Mayor of Lansing v Pub Service Comm,* 470 Mich 154, 161; 680 NW2d 840 (2004) ("Our task, under the Constitution, is the important, but yet limited, duty to read and interpret what the Legislature has actually made the law. We have observed many times in the past that our Legislature is free to make policy choices that, especially in controversial matters, some observers will inevitably think unwise. This dispute over the wisdom of a law, however, cannot give warrant to a court to overrule the people's Legislature.").

considerations may operate as a *prudential* bar to judicial policy-making in the common-law arena. This is so when we are asked to modify the common law in a way that may lead to dramatic reallocation of societal benefits and burdens.[20] As shown above, plaintiffs have sought a radical change in our negligence jurisprudence and have provided no guidance on how this proposed change might affect Michigan. In effect, we have been asked to craft public policy in the dark. This problem alone ought to make any reasonably prudent jurist extremely wary of granting the relief sought by the plaintiffs.[21]

---

[20] The Illinois Supreme Court recently expressed precisely this concern while rejecting a nuisance claim asserted by the city of Chicago and Cook County against various gun manufacturers and distributors. *City of Chicago v Beretta USA Corp,* 213 Ill 2d 351; 290 Ill Dec 525; 821 NE2d 1099 (2004). In rejecting the plaintiffs' claim that nuisance law should be expanded to hold the defendants responsible for the costs of gun violence, the court concluded:

> Any change of this magnitude in the law affecting a highly regulated industry must be the work of the legislature, brought about by the political process, not the work of the courts. In response to the suggestion of *amici* that we are abdicating our responsibility to declare the common law, we point to the virtue of judicial restraint. [*Id.* at 433.]

[21] Recent events in Louisiana reinforce the notion that the decision whether to permit a cause of action for medical monitoring is one that belongs to the Legislature. Footnotes continued on following page.

In addition to the problems presented by the legal question whether a medical monitoring cause of action exists, we are faced with the more practical questions of *how* such a monitoring program would work. For example, a threshold concern would likely be the determination of

---

In *Bourgeois v AP Green Industries, Inc*, 716 So 2d 355 (La, 1998), the Louisiana Supreme Court concluded that a cause of action for medical monitoring was cognizable under then-La Civ Code Ann, art 2315, which provided, "Every act whatever of man that causes damage to another obliges him by whose fault it happened . . . ." Although the court recognized that Louisiana law had not previously allowed the recovery of medical expenses "[a]bsent a corresponding physical injury," *Bourgeois, supra* at 358, the court decided to follow "a majority of state supreme courts faced with the issue" in recognizing a medical monitoring cause of action. *Id.* at 359. The court held, however, that medical monitoring expenses satisfied the "damage" requirement of art 2315 only if seven criteria were met. *Id.* at 360-361.

In response, the Louisiana legislature added the following language to art 2315, clearly indicating its disagreement with the Louisiana Supreme Court's decision in *Bourgeois*:

> Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease. [1999 La Acts 989, now codified at La Civ Code Ann art 2315(B).]

See, generally, Comment, *Implications of amending Civil Code Article 2315 on toxic torts in Louisiana*, 60 La L R 833 (2000).

eligibility for participation in such a program.[22] Such a determination involves the consideration of a number of practical questions and the balancing of a host of competing interests—a task more appropriate for the legislative branch than the judiciary.

Of equal concern would be the administration of such a program.[23] The day-to-day operation of a medical monitoring

---

[22] An example of just a few of the questions facing a court in determining eligibility for such a monitoring program would include: How old does the applicant have to be? How long must an applicant have lived in the affected area? Where, exactly, is the "affected area"? Must the applicant have measurable levels of dioxin in the bloodstream to qualify? If so, what is the threshold level of dioxin an applicant must have for eligibility?

The dissent's argument underscores the difficulty presented by such an inquiry. Justice Cavanagh does not "advocate that *any* exposure allows a person to bring a claim for medical monitoring costs." *Post* at 6 (emphasis in dissent). But if "any" exposure is not enough on which to rest such a claim, how much exposure is enough? The dissent apparently recognizes that a cutoff line must necessarily be drawn, in light of the competing interests at stake, but fails to offer any standards to be used in locating that line. However, such a line, if it is to be drawn at all, must be drawn not by this Court, but by the Legislature—the branch of government best able to balance the relevant interests in light of the policy considerations at stake.

[23] An example of some of the questions facing a court in administering the monitoring program would include: How would claims be filed? How would claims be processed? Who would do the processing—court staff or a private contract firm? Would a claimant be free to receive testing from any medical facility he chooses, or would a claimant's choice
Footnotes continued on following page.

program would necessarily impose huge clerical burdens on a court system lacking the resources to effectively administer such a regime. Nor do the courts possess the technical expertise necessary to effectively administer a program heavily dependent on scientific disciplines such as medicine, chemistry, and environmental science. The burdens of such a system would more appropriately be borne by an administrative agency specifically created and empowered to administer such a program. The court system, in our view, is simply not institutionally equipped to establish, promulgate operative rules for, or administer such a program.

The propriety of judicial deference to the legislative branch in expanding common-law causes of action is further underscored where, as here, the Legislature has already created a body of law that provides plaintiffs with a remedy. Were we to create an alternate remedy in such

---

of testing facility be limited? To keep down costs of the program, could defendant be permitted to establish a "preferred provider network" of medical professionals such that claimants could only be tested within the network? In the absence of such a network, would claimants be limited to the usual and necessary costs for such services, or is the sky the limit? How would the system reconcile two different physicians' opinions of what is "reasonable" in terms of medical testing? Would there be a grievance procedure? Would defendant be billed directly, or would it periodically pay into a fund?

cases—one that may be pursued in lieu of the remedy selected by our Legislature—we would essentially be acting as a competing legislative body.  And we would be doing so without the benefit of the many resources that inform legislative judgment.[24]

---

[24] Legislators face a far different decision-making calculus than judges face.  As one scholarly work recently observed:

> Legislatures are in the best position to consider far-reaching and complex public policy issues.  First, they can gather facts from a wide range of sources to help lawmakers decide whether the law should be changed and, if so, what sorts of changes should be made.  Second, legislatures make law prospectively, which gives the public fair notice about significant legal changes. . . .  Third, they must be sensitive to the will of the public; if they are not, the public can vote them out of office.  In our democratic system, if far-reaching public policy decisions are to be made, the public should have the opportunity to evaluate those changes and express their agreement or disagreement in the voting booth.

> Courts, on the other hand, are best suited to make incremental changes over time.  Judges decide cases one at a time.  Their information-gathering is limited to one set of facts in each lawsuit, which is shaped and limited by arguments from opposing counsel who seek to advance purely private interests.  Second, judges "make law" retroactively.  This creates notice and fairness problems.  Third, there is no "public light" placed on judicial lawmaking.  Judges in many states are appointed, not elected.  The public has no voice in and must accept judicial will.  When judges are elected, the public is generally

Footnotes continued on following page.

In this case, the Legislature has already provided a method for dealing with the negligent emission of toxic substances such as dioxin.  The Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, empowers the MDEQ to deal with the environmental and health effects of toxic pollution:

> *The department shall coordinate all activities required under this part and shall promulgate rules to provide for the performance of response activities*, to provide for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release, and to implement the powers and duties of the department under this part, and as otherwise necessary to carry out the requirements of this part.  [MCL 324.20104(1) (emphasis added).]

Further, MCL 324.20118 provides, among other things:

> (1)  The department may take response activity or approve of response activity proposed by a person that is consistent with this part and the rules promulgated under this part relating to the selection and implementation of response activity that the department concludes is necessary and appropriate to protect the public health, safety, or welfare, or the environment.

---

unaware of the legal opinions the judges have written or the impact of those opinions on society. [Schwartz & Lorber, *State Farm v Avery: State court regulation through litigation has gone too far*, 33 Conn L R 1215, 1219-1220 (2001).]

(2) Remedial action undertaken under subsection (1) at a minimum shall accomplish all of the following:

(a) Assure the protection of the public health, safety, and welfare, and the environment.

These provisions authorize the MDEQ to undertake "response activity" and "remedial action" when the public health is threatened by pollution. "Response activity" is defined by the NREPA as

[e]valuation, interim response activity, remedial action, demolition, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources. Response activity also includes health assessments or health effect studies carried out under the supervision, or with the approval of, the department of public health and enforcement actions related to any response activity. [MCL 324.20101(1)(ee).]

"Remedial action," which is included in the definition of "response activity," is defined under MCL 324.20101(1)(cc):

"Remedial action" includes, but is not limited to, cleanup, removal, containment, isolation, destruction, or treatment of a hazardous substance released or threatened to be released into the environment, monitoring, maintenance, or the taking of other actions that may be necessary to prevent, minimize, or mitigate injury to the public health, safety, or welfare, or to the environment.

Given this statutory framework, this much is clear: the Legislature has authorized the MDEQ to address precisely the sort of environmental and health risks occasioned by Dow's alleged emission of dioxin into the

39

Tittabawassee flood plain. Not only is the MDEQ specifically authorized under the NREPA to undertake "health assessments" and "health effect studies," MCL 324.20101(1)(ee), but the department is also empowered to take "other actions that may be necessary to prevent, minimize, or mitigate injury to the public health, safety, or welfare, or to the environment." MCL 324.20101(1)(cc). Indeed, as plaintiffs' counsel acknowledged at oral arguments, the MDEQ *has* been involved in the remediation of the Tittabawassee dioxin contamination and has engaged in a pilot medical monitoring program of residents.

Plaintiffs believe, however, that the MDEQ's response has been insufficient—that the department lacks the funding necessary to engage in medical monitoring on the scale they would prefer.[25] It is apparent, therefore, that the

---

[25] We cite the NREPA not to comment on its adequacy as a remedy for addressing environmental contamination or its effectiveness in dealing with dioxin contamination in the Tittabawassee flood plain, or to suggest that the NREPA constitutes the only appropriate remedy in dealing with "toxic tort" types of cleanups. Rather, the Legislature may, in due course, choose to enact additional legislation dealing with such cleanups, and the MDEQ may, in due course, decide that additional measures need to be taken to address dioxin levels in the Tittabawassee flood plain. We note the statutory framework merely to highlight that the NREPA arises as a result of a balancing of competing policy interests made by the people's elected representatives, and that the MDEQ, in administering the NREPA within the
Footnotes continued on following page.

40

plaintiffs are asking this Court to create a new remedy—a cause of action for medical monitoring—where the Legislature has already signaled its preference with respect to the appropriate form a remedy should take. In deference to the policy-making branch of our government, we decline to create this alternative remedial regime.[26]

IV

We have established that plaintiffs' medical monitoring claim is not cognizable under our current law and that recognition of this claim would require both a departure from fundamental tort principles and a cavalier disregard of the inherent limitations of judicial decision-making. For these reasons, defendant is entitled to summary disposition of plaintiffs' medical monitoring claim. We need address only one remaining argument:

executive branch, must undertake decisions grounded in its own expertise.

[26] We are aware that a number of courts in other jurisdictions have allowed claims for medical monitoring to proceed. See, e.g., *Petito v AH Robins Co, Inc,* 750 So 2d 103 (Fla App, 1999); *Hansen v Mountain Fuel Supply Co,* 858 P2d 970 (Utah, 1993); *In re Paoli Railroad Yard PCB Litigation,* 916 F2d 829 (CA 3, 1990); *Ayers v Jackson Twp,* 106 NJ 557; 525 A2d 287 (1987); *Burns v Jaquays Mining Corp,* 156 Ariz 375; 752 P2d 28 (Ariz App, 1987); *Friends for All Children, Inc v Lockheed Aircraft Corp,* 241 US App DC 83; 746 F2d 816 (1984). We find none of the rationales in these cases persuasive.

41

plaintiffs' contention that their request for a medical monitoring program is not subject to summary disposition under MCR 2.116(C)(8) because it is a claim for equitable, as opposed to legal, relief.[27]

Plaintiffs' reliance on the nature of the relief they seek essentially puts the cart before the horse. Regardless of what sort of remedy a plaintiff requests, we must nevertheless determine whether that remedy is supported by a valid claim. As the Kentucky Supreme Court recently observed, "It is not the remedy that supports the cause of action, but rather the cause of action that supports a remedy." *Wood v Wyeth-Ayerst Labs,* 82 SW3d 849, 855 (Ky, 2002). Here, plaintiffs have pleaded a cause of action based on a theory of negligence and have argued that we should expand the common law of torts in order to permit

---

[27] Amici have urged us to view plaintiffs' medical monitoring claim as a request for a preliminary injunction, arguing that an injunction may be granted even if irreparable harm or injury has not yet occurred. *Michigan Coalition of State Employee Unions v Civil Service Comm,* 465 Mich 212, 228; 634 NW2d 692 (2001). But this argument disregards that, in order to obtain a preliminary injunction, the movant must establish that he "is likely to prevail on the merits . . . ." *Michigan State Employees Ass'n v Dep't of Mental Health,* 421 Mich 152, 158; 365 NW2d 93 (1984). Thus, a court's prerogative to grant a preliminary injunction is tempered by the need to determine whether the movant has pleaded a claim on which he might ultimately obtain relief.

their medical monitoring claim to proceed.[28]  Plaintiffs never attempt to characterize their claim as an equitable cause of action, and point to no case law where a similar tort-based claim is held to create an equitable cause of action.

As shown above*,* plaintiffs' claim is not cognizable under our current law of negligence and is not within a permissible expansion of the common law.  Neither, perforce, is the claim based in equity.  A court cannot "create substantive rights under the guise of doing equity," or "confer rights" where none exists.  *Stein v Simpson*, 37 Cal 2d 79, 83; 230 P2d 816 (1951); *Lathrop Co v Lampert*, 583 P2d 789, 790 (Alas, 1978).  Therefore, regardless of whether the relief plaintiffs seek is equitable or legal in nature, defendant was entitled to summary disposition regarding plaintiffs' medical

---

[28] For example, plaintiffs' brief argues, "Plaintiffs seek to certify a class of individuals who, as a result of Dow's *negligence,* have suffered substantially increased risks of exposure to dioxin, and from this exposure, increased risks of developing grave but latent diseases and adverse health effects."  (Emphasis added.)  They add, "These innocent victims of Dow's *negligence* should receive periodic medical testing so that early detection and treatment can minimize the impact of any resulting illness."  (Emphasis added.)

monitoring cause of action because plaintiffs have not stated a valid cause of action.

<div align="center">V</div>

Although the dissenting opinion is passionately argued and, no doubt, well-intentioned, it is rooted in a number of fundamental misconceptions about the applicable law and about our majority opinion. Some of these errors have already been noted and need no further discussion. But three particular inaccuracies in the dissent warrant special mention.

First, the dissent argues that our holding makes "plaintiffs' physical health . . . secondary to defendant's economic health." *Post* at 2. But our opinion does no such thing. We take no position on whether defendant should or should not pay for the costs of monitoring for dioxin-related disease. Rather, we hold that plaintiff has not stated a claim under our current tort law and that the determination whether that law should change to accommodate plaintiffs' claims belongs, in our view, to the people's representatives in the Legislature.

It may be desirable that our tort law should expand to allow a cause of action for medical monitoring. But what we as *individuals* prefer is not necessarily what we as *justices* ought to impose upon the people. Our decision in

this case is driven not by a preference for one policy or another, but by our recognition that we must not impose our will upon the people in matters, such as this one, that require a delicate balancing of competing societal interests. In our representative democracy, it is the legislative branch that ought to chart the state's course through such murky waters.

Second, the dissenting opinion casts our opinion as one leaving injured plaintiffs without a remedy. See *post* at 26 ("Today, the majority holds that defendant's egregious long-term contamination of our environment and the resulting negative health effects to plaintiffs are just another accepted cost of doing business."). But our opinion does not hold that a party who actually contracts a dioxin-related disease will be foreclosed from recovery. On the contrary, assuming such a person could show physical harm and causation, the four elements of a traditional negligence claim would be met. See p 8 of this opinion. Upon such a showing, that person would be entitled to full compensation for the injury in the same manner as any other person injured by another's negligence.[29]

---

[29] We also note that there would be no statute of limitations problems for such a plaintiff. Under the so-
Footnotes continued on following page.

45

The dissent's overwrought rhetoric aside, the question is not *whether* an injured party should recover for Dow's contamination of the environment but *when* a party may be considered "injured" under Michigan tort law and recover for Dow's negligence. Justice Cavanagh may prefer a system in which polluters' resources are doled out on a first-come, first-served basis. He may be comfortable with the notion that such a regime runs the risk of diverting limited resources from those devastated by cancer, birth defects, and other dioxin-related diseases to those who have yet to manifest dioxin-related illness.[30] He is entitled to these beliefs. But his beliefs are not reflected in our common law of negligence and, given the potential repercussions of his first-come, first-served notions of justice, his vision should be turned into law,if at all,by the Legislature.

This point leads to the dissenting opinion's third and most troubling error: Justice Cavanagh's complete disregard

---

called "discovery rule," a cause of action "accrues" in the toxic tort context when an injured party knows or should have known of the manifestation of the injury. See, e.g. *Larson, supra* at 314. Provided that the injured person brings an action within three years of the date he knows or should have known of a dioxin-related injury, the statute of limitations would be satisfied. See MCL 600.5805(10).

[30] See *Metro-North Commuter R Co, supra* at 442.

for the effects that our decision may have on those other than the parties at bar.  For example, the dissent asserts that our concerns about the effects that a decision in plaintiffs' favor might have are unfounded given the nature of the relief that plaintiffs request:

> [T]he majority's prediction of a ruined economy falters after examining the true nature of the equitable relief that plaintiffs are seeking.  Notably, allowing plaintiffs to seek medical monitoring costs would not result in a windfall for plaintiffs. . . .  plaintiffs would receive no money whatsoever. . . .  The only "benefit" that a plaintiff would receive is payment for tests ordered by a doctor that are above and beyond what would generally be ordered for that plaintiff.  [*Post* at 13-14.]

The dissent asserts, in effect, that we need not trouble ourselves about recognizing plaintiffs' proposed cause of action because they seek a medical monitoring program rather than a cash payment.  What this argument ignores, of course, is that medical monitoring is not without cost.

Moreover, the dissent overlooks the fact that recognizing a cause of action before manifest injury in this case will allow *other* causes of action for negligence before manifest injury.  The dissent's disdain for our "concerns about financial impact" can be sustained only by disregarding the effect that these other preinjury actions might have on the state's economy.  To recognize a medical

47

monitoring cause of action would essentially be to accord carte blanche to any moderately creative lawyer to identify an emission from any business enterprise anywhere, speculate about the adverse health consequences of such an emission, and thereby seek to impose on such business the obligation to pay the medical costs of a segment of the population that has suffered no actual medical harm.

Worse still is the dissenting opinion's failure to consider the possible human toll of its approach. Indeed, our dissenting colleague is offended at our suggestion that allowing these plaintiffs to recover might limit resources available to those who show manifest physical injury:

> I can think of no greater misdeed than to actually argue that allowing *these plaintiffs* to seek the equitable remedy of requiring this defendant to pay for the *costs* of necessary medical monitoring tests somehow would divert resources from children with birth defects. This is fabrication at its most unforgivable—refusing to acknowledge that providing plaintiffs with the opportunity to merely seek an equitable remedy is well with the bounds of judicial discretion and will not devastate the economy or cause sick children to die. [*Post* at 19-20 (emphasis in original).]

This is an argument that can be sustained only if one believes that we live in a world in which every tortfeasor has unlimited resources to compensate those affected by its negligence. Ours, of course, is not that sort of world.

Those who do wrong necessarily have a limited capacity to compensate those who suffer from their wrongdoing.

Justice Cavanagh himself recognized this reality in *Larson v Johns-Manville Sales Corp, supra* at 304. There, he joined a majority opinion holding that manifest injury rather than exposure alone gives rise to a claim for asbestos exposure. The opinion concluded with a frank acknowledgement that this rule was necessary in light of the limited resources available to compensate injured parties:

> We believe that discouraging suits for relatively minor consequences of asbestos exposure will lead to a fairer allocation of resources to those victims who develop cancers. Rather than encouraging every plaintiff who develops asbestosis to recover an amount of money as compensation for the chance of getting cancer, we prefer to allow those who actually do develop cancer to obtain a full recovery. [*Id.* at 319.]

Thus, the *Larson* Court recognized that a rule that created an incentive for plaintiffs to seek recovery for asbestosis would limit the resources available to compensate those whose asbestosis turned to cancer.

Our nation's experience with asbestos litigation has shown that this concern was well-founded.[31]  It is therefore quite puzzling that our dissenting colleague would show such a blithe disregard for the real-world effects of his invocation of equity in this case.

Equity is indeed an instrument of justice.  But when it is exercised without due regard for the interests of those who are not before the Court, its invocation can lead to great injustice.  It is precisely because a decision in plaintiffs' favor may have sweeping effects for Michigan's citizens and its economy that we believe this matter should be handled by those best able to balance these competing interests: the people's representatives in the Legislature.

CONCLUSION

We conclude that the trial court erred in denying defendant's motion for summary disposition regarding plaintiffs' medical monitoring claim.  The cause of action

---

[31] See, e.g., Schwartz et al., *Addressing the "elephantine mass" of asbestos cases: consolidation versus inactive dockets (pleural registries) and case management plans that defer claims filed by the non-sick,* 31 Pepp L R 271, 273-274 (2003) (noting that asbestos litigation has led to "at least 78" bankruptcies, leading to "staggering" effects on the economy and, worse, fewer resources for the "truly sick").

proposed by plaintiffs is not cognizable under Michigan law.  Accordingly, we remand this matter to the Saginaw Circuit Court for entry of an order of summary disposition in defendant's favor with regard to plaintiffs' medical monitoring cause of action.

<div style="margin-left: 50%;">
Maura D. Corrigan<br>
Clifford W. Taylor<br>
Elizabeth A. Weaver<br>
Robert P. Young, Jr.<br>
Stephen J. Markman
</div>

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

GARY and KATHY HENRY, *et al.*,
    Plaintiffs-Appellees,

v                                          No. 125205

THE DOW CHEMICAL COMPANY
    Defendant-Appellant.
_____

WEAVER, J. (*concurring*).

I concur and join in the majority opinion's result, and in its reasoning.  I write separately because I do not join in the opinion's citations of an article in the *Texas Review of Law & Politics*, *ante* at 24, 31.[1]

There is better authority than a law review article to support the propositions for which the article is cited. The opinion cites the article for two propositions: (1) that "our common-law jurisprudence has been guided by a number of prudential principles. . . .  Among them has been our attempt to 'avoid capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences,'" and (2) that the judiciary is ill-advised to make decisions that involve a

_____

[1] The article is based on remarks Justice Young made at a joint Federalist Society/Ave Maria Law School symposium.

drawing of lines reflecting considerations of public policy. *Ante* at 24, 30-31.

Rather than an out-of-state, nonbinding law review article, real and binding Michigan authority for these propositions is found in our case law. See *Olmstead v Anderson,* 428 Mich 1, 11; 400 NW2d 292 (1987),[2] and *Van v Zahorik,* 460 Mich 320, 327; 597 NW2d 15 (1999).[3] Because there is binding case law for these propositions, the citations of the article written by one of the justices

---

[2] *Olmstead* noted approvingly that, in a prior case, "[t]he Court, therefore, applied the public policy exception to the lex loci doctrine, rather than making sweeping changes [by reappraising Michigan's entire conflict of laws policy] with potential unforeseen consequences."

[3] In *Van, supra* at 327, the Court quoted the following passage from the earlier Court of Appeals opinion in that case, 227 Mich App 90, 95; 575 NW2d 566 (1997):

> "As a general rule, making social policy is a job for the Legislature, not the courts. See *In re Kurzyniec Estate,* 207 Mich App 531, 543; 526 NW2d 191 (1994). This is especially true when the determination or resolution requires placing a premium on one social interest at the expense of another: 'The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's.' *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 543; 273 NW2d 829 (1979)."

signing the majority opinion can at best be described as inappropriate and unnecessary.

Further, I do not agree with some of the article's tone, nor with its comparison of the common law to

> a drunken, toothless ancient relative, sprawled prominently and in a state of nature on a settee in the middle of one's genteel garden party.[4]

An article containing such a clumsy and crude analogy that mocks the common law is unworthy of citation. The people of Michigan expressly adopted the common law, in addition to statutory laws, in the 1963 Constitution.[5]

Therefore, I concur in the result and join in the majority opinion, except the citations of the *Texas Review of Law & Politics* article.

> Elizabeth A. Weaver

---

[4] Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 302 (2004).

[5] Michigan's Constitution adopted the common law that was in force in 1963: "The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." Const 1963, art 3, § 7.

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

GARY and KATHY HENRY, et al,

    Plaintiffs-Appellees,

v                                       No. 125205

DOW CHEMICAL COMPANY,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

    The proper issue in this case is whether defendant must pay for plaintiffs' medical monitoring costs. However, rather than simply address this basic issue, the majority chooses to use this case as a vehicle to raise fears about the economy and hypothesize that providing medical monitoring to these plaintiffs would result in our state's economic disaster. The majority erroneously presents this case as one in which it must choose between an equitable remedy for plaintiffs and the economic viability of defendant and of our state. Because the dichotomy the majority has constructed is a false one, I must dissent.

    At its core, this case is about rights and responsibilities. Defendant is undeniably responsible for

years of actively contaminating the air, water, and soil that surrounds plaintiffs' homes. Defendant is undeniably responsible for the suffering that plaintiffs must endure as they face years of wondering if the contamination that they and their children have been exposed to will result in devastating illnesses and their untimely deaths. Thus, the issue is who should pay for plaintiffs' medical monitoring costs under the unique circumstances of this case when it is clear that defendant is responsible for the wrong that prompted the need for plaintiffs to be medically monitored. Stated differently, where defendant has contaminated the environment, should plaintiffs, defendant, or the taxpayers of the state of Michigan pay plaintiffs' medical monitoring costs? Whatever the majority's intent, the result of disregarding the only question properly posed in this case is that plaintiffs' physical health is inexcusably deemed secondary to defendant's economic health.

## I. PLAINTIFFS PRESENT A REASONABLE CLAIM FOR MEDICAL MONITORING COSTS

Plaintiffs are owners and residents of property located within the one-hundred-year flood plain of the Tittabawassee River in Saginaw County. The Michigan Department of Environmental Quality (MDEQ) found as much as 7,300 parts per trillion (ppt) of dioxin in the flood

plain, which substantially exceeds Michigan's cleanup standard of ninety ppt for direct residential contact.[1] After the MDEQ conducted testing, it determined that defendant was the source of the pollution. Because of the health risks that plaintiffs may face, plaintiffs seek a court-supervised medical monitoring program that is administered by qualified health professionals.

"Dioxin" is the term used to identify a number of similar toxic chemicals. Dioxin is a known human carcinogen and, as the majority notes, "'a potent carcinogen.'" *Ante* at 1 n 1 (citation omitted). Exposure to dioxin can cause cancer, liver disease, birth defects, miscarriages, and reproductive damage, as well as other illnesses. Children are more significantly affected by dioxin than adults. Dioxins do not break down easily. Once dioxin is released into the environment, it stays in the

---

[1] The Michigan Department of Community Health, the Michigan Department of Environmental Quality, and the Michigan Department of Agriculture state that "recent studies suggest that dioxins may be far more harmful to human health than was previously believed and these standards [referring to standards for drinking water and eating fish and shellfish] as well as others set for soil, sediment, and food may change in the future." Dioxins Fact Sheet.

environment for an extremely long time.[2]  When dioxin gets into a person's body, it stays indefinitely in a person's blood and body fat.  Because dioxin stays in the body for a long time, the adverse effects of dioxin exposure may not be immediate.

Plaintiffs' counsel stated at oral argument that a pilot study of the community conducted by the Michigan Department of Community Health found that fifty to eighty percent of the people tested have dioxin levels that put them in the 75th to the 95th percentile compared to the national average for their age and gender.

## II. PLAINTIFFS' CLAIM FOR MEDICAL MONITORING WARRANTS EQUITABLE RELIEF

Plaintiffs' request for a court-supervised medical monitoring program that is administered by qualified health professionals is undoubtedly reasonable.  Plaintiffs merely request that defendant pay the cost of medical monitoring to ensure that dioxin-related illnesses are caught at their

---

[2] The majority notes that defendant has entered into a settlement agreement in which "defendant will fund extensive cleanup efforts aimed at minimizing residents' exposure to dioxin." *Ante* at 7 n 3.  The specifics of this agreement indicate that defendant is willing to pay for items such as landscaping some homes to cover exposed soil and augmenting some ground cover in public parks; however, defendant remains unwilling to pay for any necessary medical monitoring costs as a result of its dioxin contamination.

earliest. Plaintiffs simply seek to minimize the devastating effects of illnesses caused by defendant's acts.

The majority, *ante* at 8, notes that "any first-year law student" knows the principle for negligence—duty, breach, causation, and damages—and argues that plaintiffs' rights have not been actually violated and they have suffered no injuries and, therefore, no damages. With this, I vehemently disagree. Plaintiffs have suffered actual harm and damages—the heightened exposure to dioxin that they received because of defendant's acts is akin to an injury. Plaintiffs were exposed to dioxin at *over eighty times* the level deemed safe for direct residential contact. Plaintiffs were advised that routine activities, such as flower gardening and lawn work, could further increase their risk of dioxin exposure. Tittabawassee/Saginaw River Flood Plain, Environmental Assessment Initiative, June 2003. Plaintiffs were further advised that they should avoid allowing their children to play in the soil to avoid further contamination. If it were not for defendant's acts, plaintiffs would not be obliged to incur the expenses involved in additional testing for early detection of any illnesses caused by the increased dioxin exposure. In this case, the exposure

5

itself and the need for medical monitoring constitute the injury. See, e.g., *Petito v AH Robins Co, Inc*, 750 So 2d 103, 105 (Fla App, 1999) ("One can hardly dispute that an individual has just as great an interest in avoiding expensive diagnostic examinations as in avoiding physical injury.").

Plaintiffs can also offer facts sufficient to establish causation, contrary to the majority's assertion. As noted by the majority, defendant's Midland plant was identified as the "'principal source of dioxin contamination in the Tittabawassee River sediments and the Tittabawassee River flood plain soils.'" *Ante* at 5 (citation omitted). Given the facts, it is entirely reasonable for plaintiffs to argue that they would not have to undergo medical monitoring tests for dioxin poisoning but for the actions of defendant. To argue that there are insufficient facts to support plaintiffs' argument is a willful avoidance of the record.

Notably, my belief that these plaintiffs should be allowed to seek equitable relief does not mean that I advocate that *any* exposure allows a person to bring a claim for medical monitoring costs. That position would indeed be imprudent. However, in this case, a candid review of the facts indicates that plaintiffs' heightened exposure

6

has caused them harm and plaintiffs have no adequate legal remedy. While plaintiffs may not have yet developed dioxin-related illnesses, the fact remains that they are at a much greater risk because of defendant's acts. As such, their long-term exposure to dioxin has caused a change in the medical monitoring that plaintiffs would otherwise be prescribed. For example, according to reasonably accepted medical practice, doctors do not generally prescribe testing to determine a patient's dioxin level. However, in this case, because of the prolonged exposure to high levels of dioxin, a doctor may, according to accepted scientific principles, find that such tests are reasonably necessary to best monitor and treat a patient. When these tests are ordered, defendant should be responsible for paying the costs of the tests because defendant is responsible for the *need* for the tests.

Plaintiffs do not, as the majority asserts, advocate for "a cause of action that departs drastically from our traditional notions of a valid negligence claim" and seek a "radical change" in negligence law. *Ante* at 24, 33.[3]

---

[3] Also, contrary to the majority's assertion, *Larson v Johns-Manville Sales Corp*, 427 Mich 301, 304-305; 399 NW2d 1 (1986), does not affect the decision before the Court today. *Larson* dealt with the statute of limitations for
Footnotes continued on following page.

Medical monitoring is recognized in a number of jurisdictions. See, e.g, *In re Paoli R Yard PCB Litigation*, 916 F2d 829, 852 (CA 3, 1990); *Stead v F E Myers Co*, 785 F Supp 56, 57 (D Vt, 1990); *Merry v Westinghouse Electric Corp*, 684 F Supp 847, 849 (MD Pa, 1988); *Bower v Westinghouse Electric Corp*, 206 W Va 133, 135; 522 SE2d 424 (1999); *Redland Soccer Club, Inc v Dep't of the Army*, 548 Pa 178, 194; 696 A2d 137 (1997); *Potter v Firestone Tire & Rubber Co*, 6 Cal 4th 965, 974; 863 P2d 795; 25 Cal Rptr 2d 550 (1993); *In re Fernald*, 1989 US Dist LEXIS 17762 (SD Ohio, 1989) (appointing trustees and special masters to administer a medical monitoring program as part of a $78 million settlement). Moreover, because of the latent nature of most illnesses resulting from exposure to dioxin, plaintiffs may not be able to establish an immediate physical injury of the type contemplated by a

---

causes of action for asbestosis and cancer related to asbestos exposure. This Court held that a cause of action for asbestosis or cancer related to asbestos exposure accrues when a person learns or should learn that he has developed asbestosis or cancer, not when he was first exposed to asbestos. This was necessary because the underlying claims in *Larson* were wrongful death actions premised on *asbestosis and cancer*. A person cannot bring a wrongful death claim for asbestosis until the victim *actually has asbestosis*. But *Larson* has no effect on whether plaintiffs can seek an equitable remedy for a court-supervised medical monitoring program that is administered by health professionals.

traditional tort action.  See, e.g., *Paoli*, *supra* at 852 ("Medical monitoring claims acknowledge that, in a toxic age, significant harm can be done to an individual by a tortfeasor, notwithstanding latent manifestation of that harm."); *Cook v Rockwell Int'l Corp (Cook I)*, 755 F Supp 1468, 1476 (D Colo, 1991) ("injuries resulting from exposure to toxic substances are often latent").  But merely because an illness is latent does not mean that plaintiffs have not been injured and suffered damages.[4]

> A plaintiff who is involved in an automobile accident and suffers no observable physical injury but nevertheless undergoes medically necessary diagnostic tests to determine whether internal injuries exist is no doubt entitled to recover the costs of the examination.  If accepted medical practice also deemed it necessary to perform such tests in the future, in order to detect the onset of any subsequently developing injury caused by the accident, the costs of the continued tests would be recoverable . . . .  The outcome should be the same when the operative incident is toxic exposure rather than collision and the potential future harm is disease rather than physical impairment. [*Miranda v Shell Oil Co*, 17 Cal App 4th 1651, 1657; 26 Cal Rptr 2d 655 (1993).]

---

[4] "The 'injury' that underlies a claim for medical monitoring--just as with any other cause of action sounding in tort--is 'the invasion of any legally protected interest.'"  *Bower*, *supra* at 139, quoting Restatement Torts, 2d, § 7(1) (1964).

See also *Friends for All Children, Inc v Lockheed Aircraft Corp*, 241 US App DC 83, 92; 746 F2d 816 (1984).

Because of the established facts in this case, a court-supervised medical monitoring program that is administered by qualified health professionals is a viable and equitable remedy for plaintiffs to seek that is nonpreclusive of any future damages claim. See, e.g, *Day v NLO, Inc*, 811 F Supp 1271, 1275 (SD Ohio, 1992) ("Because of ongoing court supervision, any medical monitoring awarded by this Court would constitute equitable relief."). An equitable remedy is necessary because there is no adequate legal remedy for plaintiffs. See *Multiplex Concrete Machinery Co v Saxer*, 310 Mich 243, 259-260; 17 NW2d 169 (1945); *Powers v Fisher*, 279 Mich 442, 447; 272 NW 737 (1937). "The absence of precedents, or novelty in incident, presents no obstacle to the exercise of the jurisdiction of a court of equity, and to the award of relief in a proper case." 30A CJS, Equity, Effect of Absence of Precedents, § 10, pp 171-172; see also 27A Am Jur 2d, Equity, § 100, p 587 ("The appropriateness of the equitable remedy is determined by current rather than past conditions."). "The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress

10

the injuries caused by unlawful action." *Freeman v Pitts*, 503 US 467, 487; 112 S Ct 1430; 118 L Ed 2d 108 (1992).

It is within the sound discretion of the courts whether to offer equitable relief. *Youngs v West*, 317 Mich 538, 545; 27 NW2d 88 (1947). Regardless of how plaintiffs may have characterized their pleadings, "[t]he court has equitable jurisdiction to provide a remedy where none exists at law, even if the parties have not specifically requested an equitable remedy, whenever the pleadings sufficiently give notice of a party's right to relief and demand for judgment." 30A CJS, Equity, Lack of Remedy at Law as Ground and Limit of Jurisdiction, § 18, p 180; see also 27A Am Jur 2d, Equity, § 216, p 699 ("Equity jurisdiction nevertheless may arise even though the claimant has pleaded no equitable claims and has not pleaded inadequacy of the remedy at law."); *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 774 n 8; 664 NW2d 185 (2003). However, contrary to the majority's assertion, plaintiffs indeed ask for equitable relief as it relates to medical monitoring. Plaintiffs' complaint states that they have no adequate remedy at law and they seek "equitable/injunctive relief in the form of a medical monitoring program . . . ."

11

While the majority argues that the separation of powers precludes it from allowing plaintiffs to proceed, I strongly disagree. The majority's framing of the issue and its subsequent argument allow it to claim that "[w]e take no position on whether defendant should or should not pay for the costs of monitoring for dioxin-related disease." *Ante* at 44. The majority's argument is essentially that its hands are tied because the Legislature has not acted. But this argument ignores a basic tenet of our system of jurisprudence–courts have the inherent power to provide equitable remedies. "Every equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate." 30A CJS, Equity, In general, § 93, p 289. The majority's steadfast insistence that it cannot allow plaintiffs to proceed because the Legislature has not acted allows the majority to sidestep the issue, instead of explicitly stating and supporting its position that these plaintiffs are unworthy of relief.

Because principles of equity are firmly entrenched in our justice system, plaintiffs' position would not require this Court to depart from longstanding principles fundamental to our justice system. "The purpose of equity

12

is to do complete justice in a case where a court of law is unable, because of the inflexibility of the rules by which it is bound, to adapt its judgment to the special circumstances of the case." 27A Am Jur 2d, Equity, Nature, Purpose, and Distinguishing Features, § 2, pp 520-521. "[E]quity is the perfection of the law, and is always open to those who have just rights to enforce where the law is inadequate." *Grand Lodge of the Ancient Order of United Workmen of the State of Michigan v Child*, 70 Mich 163, 172; 38 NW 1 (1888). Allowing plaintiffs to merely *proceed* to seek a court-supervised medical monitoring program under equity principles certainly does not stray from the foundations of Anglo-American law.

### III. EQUITABLE RELIEF PROPERLY PLACES THE RESPONSIBILITY FOR ANY MEDICAL MONITORING COSTS ON DEFENDANT, THE PARTY RESPONSIBLE FOR IMPOSING THE COSTS ON PLAINTIFFS

Throughout its opinion, the majority invokes the fear of a ruined economy to support its decision. But the majority's prediction of a ruined economy falters after examining the true nature of the equitable relief that plaintiffs are seeking. Notably, allowing plaintiffs to seek medical monitoring costs would not result in a windfall for plaintiffs. "A medical monitoring claim compensates a plaintiff for diagnostic treatment, a

13

tangible and quantifiable item of damage caused by a defendant's tortious conduct." *Cook I, supra* at 1478; see also *Paoli, supra* at 850. Notably, these *plaintiffs would receive no money whatsoever.* Payments for doctor-prescribed testing would be made through a court-supervised fund. This fund would only compensate plaintiffs for medical monitoring costs actually incurred after the monitoring was ordered by a qualified health professional. The only "benefit" that a plaintiff would receive is payment for tests ordered by a doctor that are above and beyond what would generally be ordered for that plaintiff.[5]

---

[5] This is in contrast to the relief sought in *Metro-North Commuter R Co v Buckley*, 521 US 424, 439-441; 117 S Ct 2113; 138 L Ed 2d 560 (1997). In *Metro-North*, an employee sought a change in the common law that would permit a lump-sum damages award for medical monitoring costs. The Court stated the following:

> [W]e do not find sufficient support in the common law for the unqualified rule of lump-sum damages recovery that is, at least arguably, before us here. And given the mix of competing general policy considerations, plaintiff's policy-based arguments do not convince us that the FELA [Federal Employers' Liability Act] contains a tort liability rule of that *unqualified* kind.

> This limited conclusion disposes of the matter before us. We need not, and do not, express any view here about the extent to which the FELA might, or might not, accommodate medical

Footnotes continued on following page.

Notably, the majority's concerns about financial impact can actually be alleviated to a great degree by allowing plaintiffs' practical, proactive approach. A court-supervised medical monitoring program administered by qualified health professionals would provide early detection to plaintiffs and likely *lessen* the fiscal damages that defendant would be liable for if dioxin-related illnesses are discovered later. The early detection of illnesses may allow treatment to proceed in a more reasonable manner, often with more options for the person affected than if detection had been delayed. See *Bower*, *supra* at 140. "It is common knowledge early diagnosis of many serious conditions promotes enhanced cure and survival rates." *Miranda*, *supra* at 1658. "Harm in the form of increased risk of future cancer attributable to delay in diagnosis and treatment has become so widely accepted by the medical community that the existence of such harm could be reasonably inferred from this

cost recovery rules more finely tailored than the rule we have considered. [*Id*. at 444.]

As Justice Ginsburg, concurring in part and dissenting in part, in *Metro-North*, *supra* at 455-456, noted, "If I comprehend the Court's enigmatic decision correctly, Buckley [the employee] may replead a claim for relief and recover for medical monitoring, but he must receive that relief in a form other than a lump sum."

15

professional common knowledge." *Evers v Dollinger*, 95 NJ 399, 424; 471 A2d 405 (1984). "[E]xperts continuously urge vigilant detection as the most realistic means of improving prognosis . . . ." *Id*. at 426 n 2, citing Rubin, Clinical Oncology for Medical Students and Physicians (3d ed, 1970-1971), p 33. The intent of medical monitoring is "to facilitate early diagnosis and treatment of disease or illness caused by a plaintiff's exposure to toxic substances as a result of a defendant's culpable conduct." *Miranda, supra* at 1655. Plaintiffs' counsel clearly articulated just such an example of the benefits of medical monitoring:

> Let me give you a very clear example of how medical monitoring would work in an instance like this. Say there's a woman of child bearing age and her blood is tested for high levels of dioxin and she is found to have high levels of dioxin, 95th percentile or so in her body. Medical doctors who are familiar with dioxin contamination say well one of the possible results of having high levels of dioxin contamination in your blood is that you may have depressed thyroid function. So they do a very simple test, a standard test for thyroid function and find out that there is depression of thyroid function. She is then treated and birth defects that are linked to depressed thyroid function do not happen to her [child]. She does not have a child with a birth defect because that preventative measure prevented that irreparable harm.

The establishment of a court-supervised fund for medical monitoring "encourages plaintiffs to detect and treat their injuries as soon as possible." *Paoli*, *supra* at 852.

Notably, the majority fails to mention that plaintiffs would not be *forced* to engage in medical monitoring tests if they chose not to. A court-supervised medical monitoring program would allow plaintiffs to make a choice, and those who choose to be monitored and who meet the requirements set forth by qualified health professionals could be monitored.

The majority also notes an argument—not often heard—that monitoring for the early detection of illnesses can actually be *bad* for plaintiffs because a person with an illness who is erroneously proclaimed healthy may ignore symptoms and, therefore, delay seeking necessary treatment, possibly leading to severe psychological harm. The only logical import from stating these arguments is that because plaintiffs may also be the victims of medical malpractice they should consider not going to a doctor to determine if defendant's contamination of the environment poisoned them. But a fear of medical malpractice should certainly not result in the position that plaintiffs should forgo necessary medical testing. While the majority states that it does not cite these viewpoints to endorse them, but

merely to note their existence, the majority's citation at the very least indicates that it deems them relevant considerations. I, however, do not believe that the possibility of medical malpractice should be used to support the notion that plaintiffs are not deserving of an equitable remedy.

Also, contrary to the majority, I do not believe that an equitable remedy should be refused merely because administering the remedy may be inconvenient or even difficult. "Rather, the true principle [of equitable relief] seems to be that the hardship of the plaintiff is balanced against the inconveniences and difficulties anticipated by the court, which principle is sometimes called the 'balance of convenience.'" 27A Am Jur 2d, Equity, § 101, p 587. Indeed, the desegregation of our nation's schools was certainly not an easy task, yet the United States Supreme Court found that overseeing this process was an appropriate equitable remedy for the courts. *Brown v Bd of Ed of Topeka*, 349 US 294, 300; 75 S Ct 753; 99 L Ed 1083 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs."). I certainly believe that a court in our state, just as courts have done in other

states, can determine a suitable way to administer a medical monitoring program. See, e.g., *Cook v Rockwell Int'l Corp*, 778 F Supp 512, 515 (D Colo, 1991) *(Cook II)*; *Burns v Jaquays Mining Corp*, 156 Ariz 375, 380-381; 752 P2d 28 (1987); 27A Am Jur 2d, Equity, § 103, p 588 ("[A] court of equity is clothed with the authority to designate a commission, master, receiver, or agent of the court to effectuate and supervise compliance with its decrees and orders.").

Finally, not content to merely present this case as one in which allowing plaintiffs to seek an equitable remedy would devastate the economy of Michigan, the majority also seeks to pit plaintiffs against "those devastated by cancer, birth defects, and other dioxin-related diseases . . . ." *Ante* at 46. While the majority accuses the dissent of countless transgressions, I can think of no greater misdeed than to actually argue that allowing *these plaintiffs* to seek the equitable remedy of requiring this defendant to pay for the *costs* of necessary medical monitoring tests somehow would divert resources from children with birth defects. This is fabrication at its most unforgivable-refusing to acknowledge that providing these plaintiffs with the opportunity to merely seek an equitable remedy is well within the bounds of

19

judicial discretion and will not devastate the economy or cause sick children to die.

### IV. A FURTHER REVIEW OF THE ECONOMIC CONSIDERATIONS OF PLAINTIFFS' CLAIM INDICATES THAT EQUITABLE RELIEF IS PROPER

At its core, this is not a complex case. Defendant contaminated the environment with dioxin. Because of defendant's conduct, plaintiffs require medical monitoring to ensure that the negative effects of defendant's acts can be best countered. Medical monitoring costs money. Plaintiffs, defendant, or the taxpayers of the state of Michigan must pay the costs. Because plaintiffs only require medical monitoring as a result of defendant's conduct, it seems clear that it is reasonable that defendant pay the costs.[6] This is not meant to punish defendant; it merely seeks to hold defendant to the reasonable standard that a polluter pays for the costs of polluting. "The mere fact that a wrongdoer may suffer,

---

[6] The theory behind a claim for medical monitoring is simple. When a plaintiff is exposed to a hazardous substance, it is often sound medical practice to seek periodic medical monitoring to ascertain whether the plaintiff has contracted a disease. Because this need for medical monitoring was caused by a defendant's tortious acts or omissions, a defendant may be required to pay the cost of monitoring. [*Cook I, supra* at 1477.]

however, will not deter equity from granting relief to an injured party." 27A Am Jur 2d, Equity, § 102, p 588.

The majority's decision that plaintiffs cannot seek equitable relief is indefensible when one realizes that its position leaves plaintiffs who cannot afford to pay for doctor-prescribed medical monitoring with no recourse. "Special tests are available to measure dioxin levels in body fat, blood, and breast milk, but these tests are very expensive and are not routinely available to the public." Dioxins Fact Sheet, *supra*. "Indeed, in many cases a person will not be able to afford such tests, and refusing to allow medical monitoring damages would in effect deny him or her access to potentially life-saving treatment." *Hansen v Mountain Fuel Supply Co*, 858 P2d 970, 976 (Utah, 1993) (medical monitoring costs may be awarded even when the plaintiffs have not yet suffered from any asbestos-related illnesses). As plaintiffs' counsel stated, researchers conducting the pilot studies "have been besieged by people begging to have their blood tested and particularly begging to get their children tested because it's very difficult to do that by yourself. . . . it's really, really hard for individuals to get them done because it's cost prohibitive and beyond that it's just not available to them as individuals."

Whatever its intent, the majority's result protects a wrong-doing corporation at the expense of the health of the people wronged. But we cannot turn a blind eye to defendant's repeated contamination of our state's environment because holding defendant accountable may negatively affect its profits. If defendant cannot produce its product without behaving responsibly, then it has no business operating within our state. The lives of the people in the affected area are worth more than defendant's financial well-being, even if it were indeed at stake. And contrary to the majority's position, I am fully aware of the "real-world effects" of today's decision, as plaintiffs most certainly will be as well. The "real-world effects" are that defendant, the party responsible for plaintiffs' need for medical monitoring, will not bear any of the costs of its wrongdoing. Rather, the burden now falls on plaintiffs' shoulders.

The decision to turn our backs on plaintiffs because we have not yet faced a case so egregious violates the trust that the people of the state of Michigan have placed in us. "Our oath is to do justice, not to perpetuate error." *Montgomery v Stephan*, 359 Mich 33, 38; 101 NW2d 227 (1960). "Lack of precedent cannot absolve a common-law court from responsibility for adjudicating each claim that

22

comes before it on its own merits." *Berger v Weber*, 411 Mich 1, 12; 303 NW2d 424 (1981). "It is the distinguishing feature of equity jurisdiction that it will apply settled rules to unusual conditions and mold its decrees so as to do equity between the parties." 30A CJS, Equity, Effect of Absence of Precedents, § 10, p 172. Where a claim is equitable in nature, exercising discretion may be necessary to ensure that an unconscionable decree is not entered. *Kratze v Independent Order of Oddfellows*, 442 Mich 136, 142; 500 NW2d 115 (1993). And that discretion most certainly should be exercised in this case.

While no one can say with certainty which plaintiffs will contract illnesses, suffer, and die because of their increased exposure to dioxin, this does not mean that plaintiffs cannot seek an equitable remedy. The unfortunate reality is that dioxin causes cancer, birth defects, and other illnesses. The prolonged exposure of plaintiffs to such high levels of dioxin puts them at a vastly increased risk. When a qualified health professional believes that it is in a patient's best interest to administer medical testing that would not be required if it were not for defendant's acts, this Court should not deny plaintiffs the ability to seek this modest remedy.

## V. THE "REMEDY" OFFERED BY THE NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT DOES NOT PRECLUDE PLAINTIFFS' CAUSE OF ACTION

The majority states that the Legislature has already provided plaintiffs with a remedy because the "Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, empowers the MDEQ to deal with the environmental and health effects of toxic pollution . . . ." *Ante* at 38. While the MDEQ *may* take responsive action, it is not *required* to take action. Further, the fact that the MDEQ may choose to take responsive action to minimize injury to the public health does not absolve defendant of its responsibility to plaintiffs. While the majority repeatedly claims to be concerned about the effect on Michigan's economy if plaintiffs are allowed to bring a claim against defendant, the majority's approach shifts the costs resulting from defendant's actions to Michigan taxpayers.[7] The majority distorts the fact that the MDEQ has the ability to take responsive action. Merely because

---

[7] A shift in financial responsibility conflicts with the NREPA. MCL 324.20102(f) specifically provides, "That liability for response activities to address environmental contamination should be imposed upon those persons who are responsible for the environmental contamination." See also MCL 324.20102(e).

the MDEQ has this ability does not mean that this is plaintiffs' *sole* remedy. The NREPA clearly provides "[t]hat there is a need for additional administrative and *judicial* remedies to supplement existing statutory and common law remedies." MCL 324.20102(d) (emphasis added). The MDEQ's ability to act does not eliminate defendant's responsibility to plaintiffs or eliminate the fact that plaintiffs can seek a court-supervised medical monitoring program funded by defendant.

As a case in point, a small pilot study is being conducted by the state that includes a study of residential soil at approximately twenty-five properties within the Tittabawassee River flood plain and an investigation of dioxin levels in twenty-five adults who are currently living on the flood plain and have lived there for at least five years. This Pilot Exposure Investigation is inadequate to address the concerns of the individual plaintiffs. But plaintiffs do not, as the majority asserts, bring this claim merely because the MDEQ is not conducting the study on the scale that they *prefer*. Plaintiffs seek a court-supervised medical monitoring program based on tests ordered by *qualified health professionals*; plaintiffs' individual preferences have nothing to do with the tests that will be ultimately

ordered. Medical monitoring tests would not be done to placate plaintiffs' fears; they would be done when qualified health professionals using accepted scientific principles order medical testing.

Finally, the concern of the MDEQ is *public* health, but what the MDEQ may deem appropriate to protect the public as a whole, even assuming sufficient funds were available in the budget, is not necessarily what may be in an individual plaintiff's best medical interest. Further, the MDEQ does not purport that its study can be extrapolated to provide relevant information to other people in the affected areas. The MDEQ even states in its Pilot Investigation Fact Sheet that the results of an exposure investigation (EI) are "site-specific and applicable only to the community involved in EI; they are not generalizable to other individuals or populations." The majority's insistent and inexplicable refusal to hold defendant accountable for its acts allows defendant to escape responsibility for its actions and leaves plaintiffs with no adequate remedy.

## VI. CONCLUSION

Today, the majority holds that defendant's egregious long-term contamination of our environment and the resulting negative health effects to plaintiffs are just another accepted cost of doing business. But as long as

26

defendant is not held responsible for the decisions it makes, it behooves corporations like defendant to continue with business practices that harm our residents because the courts will shield them from liability by claiming that they are powerless to act. And it is the people of our state who will pay the costs—with their money and with their lives—of allowing defendant to contaminate our environment with no repercussions. Sadly, this Court has resorted to a cost-benefit analysis to determine and, consequently, degrade the value of human life, and this is an analysis that I cannot support.

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v Madison*, 5 US 137, 163; 2 L Ed 60 (1803). Today, our Court has shirked its duty to protect plaintiffs and the people of our state, thereby leaving defendant's practices and interests unassailed. As such, I must respectfully dissent.

Michael F. Cavanagh
Marilyn Kelly

27