# STATE OF MICHIGAN

# COURT OF APPEALS

GARY HENRY and KATHY HENRY,

        Plaintiffs-Appellees,

v

DOW CHEMICAL COMPANY,

        Defendant-Appellant.

FOR PUBLICATION
June 1, 2017
9:00 a.m.

No. 328716
Saginaw Circuit Court
LC No. 03-047775-NZ

Before: GADOLA, P.J., and JANSEN and SAAD, JJ.

JANSEN, J.

Defendant appeals by leave granted a July 17, 2015 order denying its motion for summary disposition pursuant to MCR 2.116(C)(7) and (C)(8). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

This case involves allegations of negligence and nuisance brought by plaintiffs, who are owners of property downstream of defendant's Midland, Michigan operation on the Tittabawassee River flood plain. Plaintiffs claim that they have suffered loss of the free use and enjoyment of their property, as well as damages in the form of decreased property value, as a result of dioxin contamination recently discovered in the flood plain soil and connected to defendant's activities.

This case has an extensive appellate history. The Michigan Supreme Court first considered issues related to the present appeal in *Henry v Dow Chem Co*, 473 Mich 63; 701 NW2d 684 (2005) (*Henry I*), describing the basic facts and procedural history as follows:

Defendant, The Dow Chemical Company, has maintained a plant on the banks of the Tittabawassee River in Midland, Michigan, for over a century. The plant has produced a host of products, including, to name only a few, "styrene, butadiene, picric acid, mustard gas, Saran Wrap, Styrofoam, Agent Orange, and various pesticides including Chlorpyrifos, Dursban and 2, 4, 5–trichlorophenol."

According to plaintiffs and published reports from the [Michigan Department of Environmental Quality (MDEQ)], defendant's operations in Midland have had a

-1-

deleterious effect on the local environment. In 2000, General Motors Corporation was testing soil samples in an area near the Tittabawassee River and the Saginaw River when it discovered the presence of dioxin, a hazardous chemical believed to cause a variety of health problems such as cancer, liver disease, and birth defects. By spring 2001, the MDEQ had confirmed the presence of dioxin in the soil of the Tittabawassee flood plain. Further investigation by the MDEQ indicated that defendant's Midland plant was the likely source of the dioxin.

In March 2003, plaintiffs moved for certification of two classes in the Saginaw Circuit Court. The first class was composed of individuals who owned property in the flood plain of the Tittabawassee River and who alleged that their properties had declined in value because of the dioxin contamination. The second group consisted of individuals who have resided in the Tittabawassee flood plain area at some point since 1984 and who seek a court-supervised program of medical monitoring for the possible negative health effects of dioxin discharged from Dow's Midland plant. This latter class consists of 173 plaintiffs and, by defendant's estimation, "thousands" of putative members. [*Henry I*, 473 Mich at 69-70 (citations omitted).]

Defendant immediately moved for summary disposition of plaintiffs' medical monitoring claims, which involved requests for class certification and creation of a program, funded by defendant, to monitor the class members for future manifestations of dioxin-related disease, pursuant to MCR 2.116(C)(8). *Id*. at 68. After the circuit court denied defendant's motion, our Supreme Court granted defendant's emergency application for leave to appeal. *Id*. at 70. In *Henry I*, the Court considered the viability of plaintiffs' medical monitoring claims, opining that plaintiffs had raised a novel issue within the context of "toxic tort" causes of action with allegations that defendant's negligence created only the *risk* of disease. *Id*. at 67, 71-72. The Court concluded that without proof of a present, physical injury, plaintiffs did not present a viable negligence claim under Michigan's common law. *Id*. at 68. The Court declined to create a cause of action for medical monitoring in Michigan, explaining that drastic changes to the common law ought to be left to the Legislature. *Id*. at 68, 82-83, 88-89. The Court remanded the matter for entry of summary dismissal of plaintiffs' medical monitoring claim. *Id*. at 68.

After *Henry I*, plaintiffs' remaining proposed class, which plaintiffs estimated to consist of approximately 2,000 persons, consisted of all "persons owning real property within the 100-year flood plain of the Tittabawassee River on February 1, 2002." On remand, the circuit court dismissed plaintiffs' medical monitoring claims and certified the proposed class with respect to the remaining claims of negligence and nuisance. This Court granted defendant's application for leave to appeal the class certification. In a divided decision, we affirmed the class certification with respect to defendant's liability only. *Henry v Dow Chem Co*, unpublished opinion per curiam of the Court of Appeals, issued January 24, 2008 (Docket No. 266433). Defendant obtained leave to appeal to the Michigan Supreme Court. *Henry v Dow Chem Co*, 482 Mich 1043; 769 NW2d 219 (2008). In *Henry II*, the Michigan Supreme Court articulated the requirements for class certification in Michigan before concluding that "the circuit court potentially used an evaluative framework that is inconsistent with this Court's interpretation of the rule and articulation of the proper analysis for class certification." *Henry v Dow Chem Co*,

484 Mich 483, 500-503, 505-506; 772 NW2d 301 (2009). The Supreme Court remanded the matter to the circuit court for clarification. *Id*. at 507.

On remand, the circuit court concluded that it had applied the appropriate standard and reaffirmed plaintiffs' class certification. The certification was short lived. After the United States Supreme Court clarified the requirements for class certification in *Wal-Mart Stores, Inc v Dukes*, 564 US 338; 131 S Ct 2541; 180 L Ed 2d 374 (2011), the circuit court revisited the certification. The circuit court found that plaintiffs had not demonstrated commonality under the standard expressed in *Wal-mart Stores*, and revoked plaintiffs' class action certification.

Members of the proposed class were notified of the revocation, and on September 12, 2014, defendant filed the motion for summary disposition at the heart of the current appeal. Defendant argued that plaintiffs suffered an injury no later than 1984, when the public became aware of contamination resulting from defendant's release of potentially harmful dioxins into the Tittabawassee River, and sought dismissal of plaintiffs' claims as time-barred under MCR 2.116(C)(7). Defendant also sought summary disposition pursuant to MCR 2.116(C)(8), citing *Henry I* as proof that plaintiffs had not suffered a present, physical injury and noting that, without injury, plaintiffs could not make a claim in negligence or nuisance.

The circuit court denied defendant's motion on July 17, 2015. With respect to the issue of present physical injury, the circuit court explained:

> Plaintiffs allege that [defendant's] handling and disposal of dioxin has caused a long-lasting and significant contamination of Plaintiffs' property; has created a continuing nuisance which unreasonably and significantly interferes with Plaintiff's use and enjoyment of their property; has resulted in the inability of Plaintiffs to freely use their property; and has resulted in devaluation of the Plaintiff's properties. . . . Plaintiffs allege that their injury is distinct and different from that suffered by the general public because the dioxin released by [defendant] into the Tittabawassee river [sic] directly and permanently contaminated their individual private property as well as public property, has unreasonably interfered with plaintiffs' use and enjoyment of both public and private property, and has caused Plaintiffs to suffer individual financial harm in the form of decreased property values. Therefore, such allegation of present, physical injury, in addition to resulting financial damage, satisfies the pleading requirements of Michigan law for the tort of negligence.

The circuit court also determined that plaintiffs' remaining causes of actions were not time-barred, reasoning that

> [t]he type of injuries Plaintiffs allege began, at the earliest, in February of 2002, and Plaintiffs' initial action here was filed well within the three years allowed by MCL 600.5805. Plaintiffs' causes of action accrued in February of 2002 when the MDEQ's phase I sampling results were released to the public and concluded that elevated dioxin concentrations were pervasive in the Tittabawassee river floodplain. Prior to this time, Plaintiffs were free to use and enjoy their property without worry or restriction, and to sell their property without loss of value. After

-3-

this time, MDEQ's dioxin-based restrictions unreasonably and significantly interfered with Plaintiffs' use and enjoyment of their property, prevented Plaintiffs from freely using their property, and devalued Plaintiffs' property.

Defendant filed an application for leave to appeal the circuit court order with this Court on August 7, 2015. While the application was pending, plaintiffs sought leave to file a joint amended and supplemental complaint. The circuit court denied the request, instead finding that plaintiffs' claims had been misjoined. The circuit court severed the claims in plaintiffs' Third Amended Class Action Complaint, directing each plaintiff wishing to pursue a claim against defendant to raise specific allegations in an individual complaint before February 5, 2016.

This Court denied defendant's request for leave to appeal the order denying defendant's motion for summary disposition. *Henry v Dow Chemical Co*, unpublished order of the Court of Appeals, entered December 17, 2015 (Docket No. 328716). Thereafter, defendant applied for leave to appeal to the Michigan Supreme Court, and, in lieu of granting leave to appeal, the Supreme Court remanded the matter for this Court's consideration as on leave granted. *Henry v Dow Chemical Co*, 499 Mich 965; 880 NW2d 557 (2016). By the time the Supreme Court ordered the remand, 43 individual complaints had been filed in the circuit court by plaintiffs owning property in the Tittabawassee River flood plain as of February 1, 2002. Defendant has not challenged, and the circuit court has not ruled upon, any of the pending individual complaints. Our consideration is limited to the issues defendant raises with respect to the September 12, 2014 motion for summary disposition.

## II. STATUTE OF LIMITATIONS

Defendant argues that the circuit court erred when it denied defendant's motion for summary disposition pursuant to MCR 2.116(C)(7), after finding that plaintiffs' complaint was filed within the applicable three-year limitations period. We disagree.

"This Court reviews de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(7)." *Terlecki v Stewart*, 278 Mich App 644, 649; 754 NW2d 899 (2008); see also *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When addressing a motion under MCR 2.116(C)(7), we consider all documentary evidence submitted by the parties, *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001), and "accept as true the allegations of the complaint unless contradicted by the parties' documentary submissions," *Terlecki*, 278 Mich App at 649. "In the absence of disputed facts, we also review de novo whether a cause of action is barred by the applicable statute of limitations." *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378, 387; 738 NW2d 664 (2007). Summary disposition under MCR 2.116(C)(7) is proper when a claim is barred by the statute of limitations. *Terlecki*, 278 Mich App at 649.

The parties do not dispute that the applicable limitations period is three years for property damage claims arising in negligence and nuisance. MCL 600.5805(10). The parties disagree, however, on when the statute of limitations started to run. Under MCL 600.5827, the limitations period begins to run at "the time the claim accrues," which is "the time the wrong upon which the claim is based was done regardless of the time when damage results." See also *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich 264, 279; 769 NW2d

234 (2009). According to the Supreme Court, the "wrong is done when the plaintiff is harmed rather than when the defendant acted." *Trentadue*, 479 Mich at 388 (quotation marks and citation omitted). "[O]nce all of the elements of an action for injury, including the element of damage, are present, the claim accrues and the statute of limitations begins to run." *Froling Trust*, 283 Mich App at 290.

With this suit, plaintiffs espouse injury in the form direct contamination of their property with dioxins, toxic chemicals allegedly accumulating in the flood plain soil as a result of defendant's upstream activities. Plaintiffs also claim that recent warnings and restrictions, issued by the MDEQ after the 2002 discovery of dioxins in the flood plain soil, have led to a significant loss of the use and enjoyment of plaintiffs' property and diminution in property value.

In their Third Amended Class Action Complaint, plaintiffs allege specific facts to support the argument that they did not sustain injury until, at the earliest, February, 2002, when the MDEQ released "the first in a series of bulletins to inform area communities about progress, future plans, meeting dates, and other activities regarding the Tittabawassee/Saginaw River Flood Plain Dioxin Environmental Assessment Initiative." In the 2002 notice, the MDEQ explained that it had discovered "the presence of significant concentrations of dioxin in soil located in an area of the flood plain" in 2000, suggesting "the possibility that dioxins have migrated along the Tittabawassee River . . . and have been deposited onto the Tittabawassee River flood plain." *Information Bulletin, Tittabawassee/Saginaw River Flood Plain Environmental Assessment Initiative*, February 2002, p 1. The 2002 notice alerted plaintiffs to the *possibility* that dioxins were present in their soil, but stated that further analysis would determine the full extent of soil contamination. The MDEQ informed area residents, including plaintiffs, that it would *begin* an investigation of dioxin presence in floodplain soil in "Spring 2002." *Id*. at 2. In the spring of 2002, the MDEQ issued warnings to residents via a dioxin fact sheet advising that children should not play in the soil or sediment near contamination sites. Plaintiffs brought suit in March, 2003. In June, 2003, the MDEQ released another bulletin confirming the presence of toxic levels of dioxin within the flood plain and connecting the dioxin contamination with defendant's activities. In conjunction with the 2003 bulletin, the MDEQ released a supplemental advisory to the owners of "all property within the 100-year floodplain downstream of the City of Midland, that is frequently flooded by the Tittabawassee River," requiring disclosure to any person acquiring an interest in the property "the general nature and extent of the contamination," in order to "reduce health and environmental risks that would otherwise result from the actions of uninformed property owners[.]" *Supplemental Advisory Regarding Part 201 Requirements Applicable to Property Contaminated by Dioxin*, undated publication of the MDEQ, pp 1-2.

Defendant argues that plaintiffs' claims accrued no later than 1984, when, as plaintiff concedes, the public was first made aware of the presence of dioxins in the Tittabawassee River. Defendant offers a number of documentary exhibits in support of its assertion that there was evidence of dioxin pollution in the Tittabawassee River available to the public in the early 1980s. According to defendant, evidence of dioxins in the river put plaintiffs on notice that their land may also suffer contamination, and the information contained within the MDEQ fact sheet could therefore cause plaintiffs nothing more than continuing damages from a previous injury. Noting the Michigan Supreme Court's abrogation of the discovery doctrine and the continuing violations

doctrine, defendant argues that plaintiffs' claims were brought well outside the three-year statute of limitations.

We disagree with the assertion that plaintiffs' claims accrued in the early 1980s, when defendant's activities were first connected to toxic dioxin contamination of the Tittabawassee River. Again, for purposes of the limitations statute, the wrong is done and the claim accrues when the plaintiff is *harmed* rather than when the defendant acted. Defendant does not put forth any evidence to prove that its activities caused the direct harm of soil contamination to plaintiff property owners as early as it caused harm, in other forms, with its initial contamination of the waters of the Tittabawassee River. While defendant's exhibits unequivocally illustrate public knowledge of river contamination and the dangers posed by the consumption of dioxin-exposed fish as early as the 1980s, none of them suggest that dangerous levels of dioxin had reached the flood plain soils. We disagree with defendant's contention that public notice of toxic contamination of the river, its runoff, and its floodwaters, is the same as contamination of soil and sediment, and that contamination of the water is enough to place ordinary property owners on notice that nearby property may also be contaminated. The documentary evidence before this Court tends to support the inference that contamination of the flood plain soil did not occur until many years after the contamination of the Tittabawassee River. In October, 2002, defendant issued a press release acknowledging concerns over "the levels of dioxin *found* in the Tittabawassee River flood plain by the [MDEQ] in 2002," and insisting that since 1985, it had "believed that the levels of dioxins in the river were not significant." Defendant's assertion that the public was aware of flood plain soil contamination in the 1980s is further contradicted by the admission of the Environmental Protection Agency (EPA), in a 2004 memorandum, that it conducted a study of the Tittabawassee flood plain in 1988, concluding that "the sediment contamination by dioxins was not likely to be significant." In the same 2004 memorandum, the EPA acknowledged that based on "recent" data, its "original conclusion regarding dioxin in sediments was not correct."

We also disagree with plaintiffs' argument that the harm did not occur until plaintiffs "learned that the levels of dioxin released by [defendant] in the River had accumulated in floodplain soils deposited onto their properties at levels so high that the MDEQ issued notices restricting Property Owners' rights to use those properties." As our Supreme Court made clear when it abrogated the common law discovery rule in *Trentadue*, 479 Mich at 387-389, the statute of limitations begins to run when a plaintiff suffers harm, not when a plaintiff first learns of the harm. Regardless of when plaintiffs were presented with adequate information to support their claims, their claims accrued and the statute of limitations began to run when plaintiffs first suffered the harm of toxic levels of dioxin present in their soil. However, we find the distinction here to be one without a practical difference.

The 2002 MDEQ notice did not simply inform plaintiffs of the harm caused by defendants' activities. It marked the creation of the damages element necessary for plaintiffs' nuisance and negligence claims. Plaintiffs' damages, including the loss of the use and enjoyment of their property and depreciation of their property values, arose from the harm of dioxins in their soil reaching potentially toxic levels but did not exist in any tangible form until the MDEQ published its 2002 notice. As the circuit court aptly noted, "[p]rior to this time, Plaintiffs were free to use and enjoy their property without worry or restriction, and to sell their property without loss of value." A claim does not accrue for purposes of the limitations statute until every

element of the claim, *including damages*, is present. *Froling Trust*, 283 Mich App at 289-290. Plaintiffs' claims did not accrue until the 2002 MDEQ notice was released and plaintiffs first suffered damages as a result of dioxin contamination. The circuit court therefore did not err when it found that plaintiffs' March 2003 complaint was filed within the three-year limitations period and denied defendant's motion for summary disposition under MCR 2.116(C)(8).

Although defendant argues otherwise, we find that our conclusion is consistent with our Supreme Court's holdings in *Trentadue* and *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263; 696 NW2d 646 (2005). In *Trentadue*, the Supreme Court abrogated the discovery doctrine after finding that the "statutory scheme is exclusive and thus precludes th[e] common-law practice of tolling accrual based on discovery in cases where none of the statutory tolling provisions apply." *Trentadue*, 479 Mich at 389. The Court explained that "[u]nder a discovery-based analysis, a claim does not accrue until a plaintiff knows, or objectively should know, that he has a cause of action and can allege it in a proper complaint." *Id*. at 389. However, the *Trentadue* Court confirmed that a claim accrues when the wrong is done, and "[t]he wrong is done when the plaintiff is harmed[.]" *Id*. at 387-388. In other words, the discovery rule abrogated in *Trentadue* applied to extend the statute of limitations on a claim for which all of the elements were present, but one or more of the necessary elements was unknown, or should not reasonably be known, to the plaintiff. It does not follow that application of a discovery doctrine is necessary to extend the statute of limitations on a claim that has not yet accrued because one of the elements is not yet present. Presence of a necessary element and knowledge of an existing cause of action are simply not the same. Application of the discovery doctrine was not necessary to save plaintiffs' claim from the statute of limitations, which did not begin to run until all of the elements of plaintiffs' nuisance and negligence claims were present. The *Trentadue* Court's abrogation of the discovery rule does not limit our decision here.

Similarly, in *Garg*, 472 Mich at 282-283, the Michigan Supreme Court expressly abrogated the continuing wrongs doctrine after finding that use of the doctrine was contrary to the express intent of the Legislature. The continuing wrongs doctrine, an exception to the statute of limitations previously recognized by our courts, states that, "[w]here a defendant's wrongful acts are of a continuing nature, the period of limitations will not run until the wrong is abated; therefore, a separate cause of action can accrue each day that the defendant's tortious conduct continues." *Horvath v Delida*, 213 Mich App 620, 626; 540 NW2d 760 (1995). The Court held that the continuing violations doctrine is contrary to the plain language of MCL 600.5805 and "has no continued place in the jurisprudence of this state." *Garg*, 278 Mich App at 654. The *Garg* Court's abrogation of the continuing wrongs doctrine is not relevant to the issues presented here. Plaintiffs filed their complaint within the applicable limitations period and have not attempted to rely on the continuing violations doctrine to extend that period beyond the three years from the time their claim accrued.

Because we find that plaintiffs' complaint was filed within the three-year limitations period under Michigan law, we need not address plaintiffs' contention that the discovery rule in section 309 of The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 USC 9601 *et seq*., preempts our Supreme Court's interpretation of the Michigan statute of limitations to provide for application of a discovery rule in toxic tort cases.

### III. PRESENT PHYSICAL INJURY

Next, defendant argues that plaintiffs failed to allege a present, physical injury, and the trial court erred in denying summary disposition under MCR 2.116(C)(8). We disagree.

Summary disposition under MCR 2.116(C)(8) is appropriate when a plaintiff " has failed to state a claim on which relief can be granted." "A motion brought under subrule (C)(8) tests the legal sufficiency of the complaint solely on the basis of the pleadings." *Dalley v Dykema Gossett*, 287 Mich App 296, 304; 788 NW2d 679 (2010). "A party may not support a motion under subrule (C)(8) with documentary evidence such as affidavits, depositions, or admissions." *Id.* When this Court reviews motions for summary disposition under MCR 2.116(C)(8), we accept all well-pleaded factual allegations as true and construe them in a light most favorable to the nonmovant. *Maiden*, 461 Mich at 119. A motion brought under MCR 2.116(C)(8) should only be granted when "the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Dalley*, 287 Mich App at 305 (quotation marks and citation omitted).

In support of its motion for summary disposition under MCR 2.116(C)(8), defendant relies heavily on the Supreme Court's opinion in *Henry I*. Defendant interprets *Henry I* as requiring plaintiffs to establish a present, physical injury to person or property in order to bring any tort action, including negligence and nuisance. However, as previously discussed, the *Henry I* Court addressed a novel claim for medical monitoring, brought by one of two distinct classes of individuals. The medical monitoring class "consisted of individuals who have resided in the Tittabawassee flood plain area at some point since 1984 and who seek a court-supervised program of medical monitoring for the possible negative health effects of dioxin," and was separate and distinct from a second class, "composed of individuals who owned property in the flood plain of the Tittabawassee river [sic] and who alleged that their properties had declined in value because of the dioxin contamination." In *Henry I*, the Court considered only the claim for medical monitoring, finding that negative health effects had yet to present themselves and that plaintiffs' claim was based solely on fear of future physical injuries. The Supreme Court "reaffirm[ed] the principle that a plaintiff must demonstrate a present physical injury to person or property in addition to economic losses that result from that injury in order to recover under a negligence theory," *id* at 75-76, and remanded the matter to the circuit court for entry of summary disposition of plaintiffs' medical monitoring claim in favor of defendants. However, it made no ruling with regard to the sufficiency of the negligence and nuisance claims raised by the property-owner class.

Later, in *Henry II*, the Supreme Court considered the circuit court's certification of the second class, estimated to consist of approximately 2,000 persons, with respect to the remaining claims of negligence and nuisance. *Henry II*, 484 Mich at 491-492. Again, the Court did not consider the sufficiency of plaintiffs' remaining claims, but remanded the matter to the circuit court for evaluation in accordance with its articulated requirements for class certification. *Id.* at 504. In a separate opinion, Justice Corrigan, the author of the majority opinion in *Henry I*, suggested that the circuit court on remand carefully consider the issue of actual injury, which many of the 2,000 proposed class members were unable to prove. Justice Corrigan explained that "*Henry I* created a bright line rule by unambiguously requiring a plaintiff alleging *negligence* to prove present physical injury," before opining that "the owners of uncontaminated

property do not have present physical injuries" and "cannot allege *negligence* under Michigan law." *Henry II*, 484 Mich at 533 (CORRIGAN, J., concurring; emphasis added).

We agree with Justice Corrigan's articulation of the Supreme Court's holding in *Henry I*. While the *Henry I* Court declined to expand the definition of present, physical injury to include medical monitoring, it did not, as defendant contends, hold that plaintiffs could not succeed in proving some present injury, or that the requirement of present physical injury applied in all tort cases. We also agree with Justice Corrigan's conclusion that owners of uncontaminated property could not demonstrate present injury to support a negligence action, regardless of whether they had already incurred economic damages. As the Supreme Court explained in *Henry I*:

> It is no answer to argue, as plaintiffs have, that the need to pay for medical monitoring is itself a present injury sufficient to sustain a cause of action for negligence. In so doing, plaintiffs attempt to blur the distinction between "injury" and "damages." While plaintiffs arguably demonstrate economic losses that would otherwise satisfy the "damages" element of a traditional tort claim, the fact remains that these economic losses are wholly derivative of a possible, future injury rather than an actual, present injury. A financial "injury" is simply not a present physical injury, and thus not cognizable under our tort system. [*Henry I*, 473 Mich at 78.]

As Justice Corrigan noted in *Henry II*, many of the proposed class members were unable to prove that their property was contaminated and that they suffered anything more than economic losses. However, this fact did not entitle defendant to summary disposition of plaintiffs' negligence claim pursuant to MCR 2.116(C)(8), which must be based on the pleadings alone, construed in favor of the nonmoving party. Plaintiffs, in their Third Amended Class Action Complaint, alleged actual injury in the form of direct contamination and restrictions on the use of their property. Factual issues relating to damages were not properly before the circuit court, and are not before this Court on appeal. Accepted as true, plaintiffs' allegations identify a present, physical injury to support their negligence claims.

Similarly, the trial court did not err when it denied defendants' motion for summary disposition of plaintiffs' nuisance claims under MCR 2.116(C)(8). Plaintiffs alleged both public and private nuisance. "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Adkins v Thomas Solvent Co*, 440 Mich 293, 302-303; 487 NW2d 715 (1992). "The essence of private nuisance is the protection of a property owner's or occupier's reasonable comfort in occupation of the land in question." *Id*. at 303. "A public nuisance is an unreasonable interference with a common right enjoyed by the general public." *Cloverleaf Car Co v Phillips Petroleum Co*, 213 Mich App 186, 190; 540 NW2d 297 (1995). According to our Supreme Court, "[t]here are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment." *Adkins*, 440 Mich at 303. "The pollution of ground water may constitute a public or private nuisance." *Id*. Importantly, while a defect threatening or imposing danger may support a cause of action for nuisance, *id*. at 303-304, property depreciation related to fear of future injuries, on its own, is insufficient, *id*. at 311-312.

Defendant's contention that plaintiffs have only stated a claim for fear of future injury is not supported by the record. In their Third Amended Class Action Complaint, plaintiffs alleged injury in the form of direct contamination of their groundwater and restrictions on the use of their property. In contrast to plaintiffs' claims for personal injury, which were dismissed after *Henry I* as yet to manifest themselves in physical form, plaintiffs here allege actual injury to their property, as well as a depreciation of property value. Specifically, and among other allegations, plaintiffs claim that based on the 2002 MDEQ notice and subsequent investigation by the MDEQ and the EPA, their children are no longer safe to play in the soil or sediment near sites of known or suspected contamination. Plaintiffs allege that dioxins were detected in samples extracted from local, free-range chickens owned by residents with property in the flood plain. Plaintiffs allege that their ability to sell their homes and move from the area is has been impeded, as they are now required to disclose information regarding the contamination and risk of harm to potential home buyers. Although the diminution in property value on its own would not support plaintiffs' nuisance claims, plaintiffs have also alleged specific, existing defects, caused by defendants' actions, which constitute a significant and continuing interference with the use and enjoyment of plaintiffs' property. Accepted as true, these allegations preclude summary disposition under MCR 2.116(C)(8).

## IV. JUDICIAL ESTOPPEL

Finally, defendant argues that the trial court erred in denying its motion for summary disposition based on judicial estoppel. According to defendant, plaintiffs should be estopped from asserting a present, physical injury where they repeatedly represented their damages as limited to a threat of future injury. We disagree.

We review the application of judicial estoppel de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008); *Szyszlo v Akowitz*, 296 Mich App 40, 46; 818 NW2d 424 (2012). "Judicial estoppel is an equitable doctrine, which 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " *Spohn v Van Dyke Public Schools*, 296 Mich App 470, 479; 822 NW2d 239 (2012) (citation omitted). Judicial estoppel is an "extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." *Opland v Kiesgan*, 234 Mich App 352, 364; 594 NW2d 505 (1999) (quotation marks and citation omitted). "It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims." *Id*. Michigan has adopted the prior success model of judicial estoppel. *Paschke v Retool Indus*, 445 Mich 502, 509; 519 NW2d 441 (1994). This means that "[f]or judicial estoppel to apply, a party must have successfully and 'unequivocally' asserted a position in a prior proceeding that is 'wholly inconsistent' with the position now taken." *Szyszlo*, 296 Mich App at 51, quoting *Paschke*, 445 Mich at 509-510. "[T]he mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted that party's position as true." *Spohn*, 296 Mich App at 480. "Further, in order for the doctrine of judicial estoppel to apply, the claims must be wholly inconsistent." *Id*.

Defendant argues that plaintiffs should be estopped from asserting that they have suffered a present physical injury because they supported their request for class certification and medical monitoring with a representation that the claims shared by each member of the class were based

on a threat of future injury. However, defendant's argument is not supported by the record. Plaintiffs have not asserted "wholly inconsistent" arguments. As we have already noted, plaintiffs' Third Amended Class Action Complaint references present injury in the form of direct contamination and interference with plaintiffs' use and enjoyment of property to support claims of negligence and nuisance. The Complaint, which defendant now challenges, was filed in 2003, before the Supreme Court's decisions in *Henry I* and *Henry II*, and plaintiffs' positions throughout the proceedings have been consistent with their assertion of present, physical injury.

While the Supreme Court considered plaintiffs' claims for future injury with respect to the medical monitoring claim in *Henry I*, there is no evidence that plaintiffs unequivocally stated that their *only* injuries related to threats of future harm, or that the Court relied on any such representation. Plaintiffs' negligence and nuisance claims, which are based on allegations separate and distinct from those supporting plaintiffs' medical monitoring claims, were not at issue. Indeed, the Court in *Henry I* was careful to limit the application of its decision to plaintiffs' request for medical monitoring. Then, in *Henry II*, the Court explicitly stated that it was considering a dispute concerning the circuit court's decision to grant plaintiffs' motion for class certification, "based on theories of negligence and nuisance," and arising from allegations that plaintiffs, "along with the proposed class members, have incurred property damage caused by the dioxin contamination." *Henry II*, 484 Mich at 488-489. The Supreme Court's statement directly contradicts any inference that the Court assumed that all of plaintiffs' claims were based only on threat of future injury. In any case, plaintiffs did not "prevail" in their request for medical monitoring, based only on threat of future injury. Nor did they successfully obtain class certification. Judicial estoppel simply does not apply.

## V. CONCLUSION

We find that the trial court did not err when it determined that plaintiffs' claims accrued in 2002 and were not barred by the statute of limitations. We also find that the trial court did not err when it determined that plaintiffs have alleged a present, physical injury with regard to their negligence and nuisance claims, and that the doctrine of judicial estoppel does not bar plaintiffs' claims in this regard. The trial court properly denied defendant's request for summary disposition pursuant to MCR 2.116(C)(7) and (C)(8).

Affirmed.

/s/ Kathleen Jansen
/s/ Henry William Saad

-11-